Argued and submitted January 5, decision of the Court of Appeals reversed; orders of the circuit court affirmed; case remanded to circuit court for further proceedings April 4, 1996

STATE OF OREGON,
*Respondent on Review,*

*v.*

PHILLIP MARK CARSTON,
*Petitioner on Review.*

(CC 93-CR-0259-TM; CA A82360 (Control); SC S42237)

STATE OF OREGON,
*Respondent on Review,*

*v.*

CHERYL LYNN SAGE,
*Petitioner on Review.*

(CC 93-CR-0260-TM; CA A82363)

STATE OF OREGON,
*Respondent on Review,*

*v.*

ARLEN JOSEPH SAGE,
*Petitioner on Review.*

(CC 93-CR-0261-TM; CA A82364)
(SC S42320)

STATE OF OREGON
*Respondent on Review,*

*v.*

EDWARD GRALLA,
*Petitioner on Review.*

(CC 93-CR-0229-ST; CA A82626; SC S42309)
(Cases Consolidated)

913 P2d 709

David A. Hill, Eugene, argued the cause and filed the petition for petitioner on review Carston.

Eric R. Johansen, Deputy Public Defender, Salem, argued the cause for petitioner on review Gralla. With him on the briefs was Sally L. Avera, Public Defender.

Ron Brown, Bend, filed the petition for petitioners on review Sage.

Kaye E. Sunderland, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Carson, Chief Justice, and Gillette, Fadeley, Unis, Graber, and Durham, Justices.**

GRABER, J.

** Van Hoomissen, J., did not participate in this decision.

**GRABER, J.**

Defendants seek review of a decision of the Court of Appeals that reversed the trial court's orders suppressing evidence. For the following reasons, we reverse the decision of the Court of Appeals and affirm the orders of the trial court.

On March 19, 1993, an officer in the Redmond Police Department received a telephone call from a private citizen (informant) in Eugene. The informant told the officer that he had reason to believe that an illicit drug transaction was going to take place in the early morning hours of March 20.

The informant told the officer that he had been using his "scanner," a device that receives radio transmissions, and had overheard a cordless telephone conversation. In that conversation, a man named Phil (defendant Carston), who was calling from Eugene, made arrangements to meet a man named Ed (defendant Gralla) at 2 a.m., at Ed's house in Redmond, to buy $300 of "really good stuff." Phil told Ed that he would be driving a four-door Suzuki. Ed told Phil that his house was on Southwest Indian Avenue and that the house could be identified by a "cherry picker * * * black Ranchero and Alcoa Aluminum wheel in front of the house."

Based on that information, the Redmond police went to Southwest Indian Avenue and located a house with a cherry picker and black Camaro parked in front. The police noted the license numbers of the cars parked near the house; they learned that one car was registered to Wendy Wrey, a girlfriend of defendant Gralla. Their investigation of other narcotics cases had led the police to suspect that Gralla was a drug supplier.

An officer returned to the house at about 3 a.m. and saw a four-door Suzuki parked in front of it. That car was registered to defendant Cheryl Lynn Sage of Coburg. Later, another officer saw that same car at a Redmond bank. He also observed a person from the car use an automated teller machine. The police then followed the Suzuki back to the house on Southwest Indian Avenue. The police saw one of the

occupants of the car go into the house. Twenty minutes later, the Suzuki left.

At 3:40 a.m., the police initiated a traffic stop of the Suzuki for having tinted windows in violation of ORS 815.220.[1] Defendant Carston was driving the Suzuki, and defendants Arlen Joseph Sage and Cheryl Lynn Sage were passengers. After the stop, the police saw the pistol grip of a semi-automatic pistol between the right front passenger seat and the center console. The police patted down the occupants of the car and asked Carston for consent to search for more weapons. He gave consent. While searching the car, the officers found a closed container; they opened the container and found drugs and drug paraphernalia. The police searched Cheryl Lynn Sage's purse and found a paper bindle containing a drug later determined to be methamphetamine. That paper bindle had defendant Gralla's address written on it.

Later that morning, the police obtained consent from an occupant to search the house on Southwest Indian Avenue.[2] They discovered drug paraphernalia, a bindle of methamphetamine, and the other half of the piece of paper found in Cheryl Lynn Sage's purse. The police questioned the occupant of the house. The occupant told them that he had been at a bar with Gralla most of the previous night and that Gralla had received a telephone call and had asked to be taken to the house. The occupant took Gralla to the house and returned to the bar. The occupant also told the police that Gralla always had "crank" on him. The police placed Wrey's home under surveillance and arrested Gralla there later that morning. In a search incident to that arrest, the police found a bindle of methamphetamine.

Defendants were charged with various counts of manufacture and delivery of controlled substances in violation of ORS 475.992.[3] Before trial, defendants moved to suppress all evidence obtained during, or derived from, the searches conducted on March 20 and 21, 1993. At the pretrial

---

[1] ORS 815.220 proscribes the "obstruction of vehicle windows." Defendants do not argue to this court that they did not violate that statute.

[2] On review, defendants do not challenge the validity of that consent.

[3] ORS 475.992 provides in part that "it is unlawful for any person to manufacture or deliver a controlled substance."

suppression hearing, the trial court held that the searches were unlawful, because the police relied on information from the informant that he had obtained in violation of ORS 165.540*(1)*.

The state appealed, and the cases were consolidated. The Court of Appeals reversed, reasoning that ORS 165.540*(4)* applied and that, therefore, the information obtained from the informant, and all that followed from it, should not be suppressed. *State v. Carston*, 133 Or App 494, 501, 891 P2d 1366 (1995). We quote the relevant statutes below. The Court of Appeals rejected defendants' additional arguments in support of suppression and held that there was probable cause for all the searches and arrests. *Id.* at 501-02.

Defendants petitioned this court for review arguing, among other things, that the Court of Appeals' interpretation of ORS 165.540(4) was erroneous. We allowed review limited to the following issue:

"Whether a telephone conversation between private citizens using a cordless telephone is a communication for the use of the general public within the meaning of ORS 165.540(4)."

ORS 165.540(1) provides in part:

"[N]o person shall:

"(a)   Obtain or attempt to obtain the whole or any part of a telecommunication or a radio communication to which such person is not a participant, by means of any device, contrivance, machine, or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by at least one participant.

"\* \* \* \* \*

"(d)   Obtain the whole or any part of a conversation, telecommunication or radio communication from any person, while knowing or having good reason to believe that such conversation, telecommunication or radio communication was initially obtained in a manner prohibited by this section.

"(e)   Use or attempt to use, or divulge to others any conversation, telecommunication or radio communication obtained by any means prohibited by this section."

ORS 165.540(4) provides:

> "The prohibitions in subsection (1)(a) of this section do not apply to the receiving or obtaining of the contents of any *radio* or television *broadcast transmitted for the use of the general public.*" (Emphasis added.)

■　　For the purposes of applying those statutes to this case, a brief explanation of how cordless telephones function is helpful. We take judicial notice of the following facts. *See* OEC 201(c) (providing for judicial notice).

A cordless telephone consists of two parts, a base unit and a portable unit (or handset). As with a conventional telephone, the base unit of a cordless telephone is connected to a jack. A conventional telephone has a cord that links the base unit to the portable unit. With a cordless telephone, there is no connecting cord; instead, the base unit transmits a low-power radio signal that the portable unit receives. The portable unit also transmits a low-power radio signal that the base unit receives and transmits into the telephone system's wiring through the jack. *See generally* Stephen J. Bigelow, *Understanding Telephone Electronics*, 323-26 (3d ed 1991) (explaining how cordless telephones work); *see also U.S. v. Smith*, 978 F2d 171, 178 (5th Cir 1992) (same), *cert den* 507 US 999 (1993); *People v. Fata*, 559 NYS2d 348, 350, 159 AD2d 180 (App Div) (same), *appeal den* 563 NYS2d 774 (1990); *State v. Smith*, 149 Wisc 2d 89, 96-97, 438 NW2d 571 (1989) (same); Note, *Don't Touch that Dial: Radio Listening Under the Electronic Communications Privacy Act of 1986*, 63 NYU L Rev 416, 420 (1988) (same).

The radio transmissions from handset and base go in all directions, like "a stone dropped into a pool of water, which results in the transmission of equal waves of energy in all directions, which will lap against any obstacle in the path of the emanating and ever enlarging concentric circles until the wave energy transmitted is totally diminished." *State v. Smith*, 149 Wisc 2d at 97. A cordless telephone has a limited range, typically of less than 100 feet, but occasionally as far as 1,000 feet, depending on the unit's design and location. Bigelow, at 325. *See also U.S. v. Smith*, 978 F2d at 179 ("[t]he effective range of cordless phones varies greatly from model to model; many are limited to a range of about sixty feet,

barely beyond the average house or yard"); *Fata*, 559 NYS2d at 350 (stating that cordless telephones "ordinarily have a range of about 50 feet"); *Smith*, 149 Wisc 2d at 97 ("[w]eak signals * * * may be intercepted within about one thousand feet"); Note, 63 NYU L Rev at 421 ("cordless telephones transmit * * * over relatively short distances").[4] Scanners (or other devices designed to intercept radio signals) can intercept radio transmissions sent between the handset and base station if they are within the range of those transmissions. *See U.S. v. Smith*, 978 F2d at 179 ("radio *scanners* * * * can still monitor most cordless phones") (emphasis in original); *Fata*, 559 NYS2d at 350 ("[b]ecause [cordless] telephones operate on common radio frequencies, the conversations can be monitored"); *State v. Smith*, 149 Wisc 2d at 97 (the radio transmissions from handset to base station "may be intercepted within about one thousand feet by anyone with a scanner, compatible cordless telephone, or other radio receiver"); Bigelow, at 326 (stating that cordless telephone radio transmissions are subject to "eavesdropping"); Note, 63 NYU L Rev at 421 ("[c]ordless telephones use frequencies which are accessible using common equipment, and thus are easy to intercept").

Four points are *undisputed* in this case: (1) The cordless telephone conversation intercepted by the informant was a "radio communication" as that term is used in ORS 165.540(1).[5] (2) The informant obtained part of that radio communication by means of a device (a scanner), without the consent of either Carston or Gralla, in violation of ORS 165.540(1)(a). (3) The informant divulged that information to the police, in violation of ORS 165.540(1)(e). (4) The police used and relied on the information obtained by the informant, in violation of ORS 165.540(1)(d) and (e).

---

[4] Improved technology has increased the potential range of a cordless telephone, but the typical range remains relatively short.

[5] For the purposes of ORS 165.540, a "radio communication" is defined as

"the transmission by radio or other wireless methods of writing, signs, signals, pictures and sounds of all kinds, including all instrumentalities, facilities, equipment and services (including, among other things, the receipt, forwarding and delivering of communications) incidental to such transmission." ORS 165.535(3).

The only *disputed* issue on review is whether the statutory exception provided in ORS 165.540(4) applies. *See* 323 Or at 80, above (stating limited issue allowed on review). The state argues that the intercepted conversation is a "radio * * * broadcast transmitted for the use of the general public" and, therefore, that the exception to the prohibitions in ORS 165.540(1) applies. Defendant argues that the intercepted conversation does not fall within the exception provided in ORS 165.540(4) and, therefore, that the court must suppress the content of that conversation and everything flowing from it. In order to resolve that dispute, we interpret ORS 165.540(4). *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993) (discussing method of interpreting statutes).

■ Defendants argue that the transmission intercepted by the informant was not a "broadcast." There is no statutory definition of "broadcast." Ordinarily, "broadcast" means, as pertinent,

> "the act of making widely known : the act of spreading abroad * * *; *specif*: the act of sending out sound or images by radio or television transmission esp. for general reception * * * : a single radio or television program * * *[.]" *Webster's Third New Int'l Dictionary*, 280 (unabridged ed 1993).

That definition suggests that a broadcast involves the dissemination of radio transmissions over a wide area.

The radio signal communicated between a cordless telephone handset and base station is a weak one. If the user takes the handset a certain distance from the base station — usually 1,000 feet or less — the base station will not receive the signal from the handset. In the absence of some other communicative medium, the weak signal transmitted between the handset and the base station precludes the user of a cordless telephone — the initiator of the radio transmission — from making the information in that transmission "widely known," even if the user of the telephone intends it to be.

The state argues that the transmission between the handset and the base station is "for general reception" nonetheless, because "[c]ordless phones do not create a directional

[transmission], but are classified, rather, as 'omni-directional,' meaning that they transmit in every direction." The state reasons that, because the signal between the handset and the base station is circular rather than linear and is receivable by devices other than the handset and base station, the transmission is receivable generally (within that circle) and, therefore, is "for general reception."

The context of ORS 165.540(4) detracts from the state's argument. As noted above, 323 Or 82 n 5, ORS 165.535(3) defines "radio communication" for the purposes of ORS 165.540. That definition encompasses any and all radio or wireless transmissions, including the cordless telephone conversation intercepted in this case. The legislature chose to use the term "radio communication" in ORS 165.540(1)(a), (d), and (e) when it delineated prohibited activities. In the statutory exception to ORS 165.540(1) provided in ORS 165.540(4), however, the legislature exempted "radio * * * broadcast[s]," not "radio communication[s]."

■ Under the statutory scheme provided in ORS 165.540, "radio broadcast[s]" are a subset of "radio communication[s]." The term "radio broadcast" does not encompass all transmissions made by generating radio waves. The state's reading of ORS 165.540(4) does not accommodate that distinction. Under the state's reading of ORS 165.540(4), all radio transmissions — and thus all "radio communications," as that term is defined in ORS 165.535(3) — would be "radio broadcasts." By contrast, defendants' reading of ORS 165.540(4) accommodates the distinction between "radio communication[s]" and "radio * * * broadcast[s]," as those terms are used in ORS 165.540, and thereby gives effect to all provisions of that statute. See PGE, 317 Or at 611 (when possible, this court construes a statute to give meaning to all its provisions).

Defendants also argue that a transmission from a cordless telephone is not "for the use of the general public"; ORS 165.540(4) exempts radio broadcasts transmitted "for the use of the general public." "Use" is "a particular service or end : PURPOSE, OBJECT, FUNCTION." Webster's, at 2523. The "particular * * * end" to be achieved by the radio transmission intercepted by the informant was to send radio

transmissions between the handset and the base station. Although that transmission was accessible by the informant, it was not transmitted for that purpose.

Similarly, the radio transmission created by defendant Carston's cordless telephone was not for "the general public." The "public" is "an organized body of people." *Id.* at 1836. "General" is defined, as pertinent, as "something (as a concept, fact, idea, principle, proposition, or statement) that comprehends the whole or total." *Id.* at 944. The radio transmissions between a cordless telephone handset and the corresponding base station are not intended for the whole community. Rather, the radio transmissions sent between handset and base station are intended for the specific recipient of the call.

After our review of the text and context of ORS 165.540(4), we conclude that its meaning is clear as it pertains to the question presented. A telephone conversation between or among private citizens, when one or more of the parties uses a cordless telephone, is not a "radio * * * broadcast transmitted for the use of the general public" within the meaning of ORS 165.540(4).[6]

The trial court did not err when it held, first, that the police had violated ORS 165.540(1)(d) by relying on the information gathered by the informant in violation of ORS 165.540(1)(a) and, second, that the exception provided in ORS 165.540(4) did not apply.

■ ■ The trial court concluded that suppression was required with respect to all the evidence that was derived, directly or indirectly, from the information provided by the informant. The state argues that suppression is not a proper remedy for a violation of ORS 165.540. We disagree. The legislative intent is clear. Under ORS 165.540(1)(e), no person is

---

[6] The state asserts that such a holding necessarily would mean that "a citizen commits a crime by overhearing the radio portion of a cordless telephone conversation on a scanner or other device," even if that interception is unintentional. We disagree. Nothing in our decision today requires us to consider whether a person would violate ORS 165.540(1) in the absence of intent. The informant in this case acted intentionally in obtaining the conversation, and the police relied on the information intentionally, knowing its source.

entitled to use for any purpose an intercepted radio communication of the kind at issue. "Person" includes the state, *see* ORS 165.535(2) (defining "person" for the purposes of ORS 165.540), and "use" includes use to obtain evidence. In the circumstances of this case, the legislative purpose can be fulfilled only through suppression. Accordingly, suppression is a proper remedy for the violation of ORS 165.540(1) here. *See State v. Davis*, 295 Or 227, 23-37, 666 P2d 802 (1983) (discussing circumstances in which suppression is a proper remedy for a statutory violation).

The trial court concluded that the officers lawfully stopped the Suzuki for having tinted windows. The trial court also concluded that, after seeing the pistol grip of a gun in the car, the officers were authorized to conduct a limited search of the passenger compartment of the car, for more weapons, and to pat down defendants for weapons, for the purpose of officer safety. Defendants do not challenge either of those holdings here.

■■ The trial court then found, as a factual matter, that (1) after the officers had removed defendants from the car and the officers' safety was assured, the officers began questioning defendant Carston and the Sages about controlled substances and (2) that questioning was "based upon the prior illegally intercepted information obtained from the informant."[7] The trial court further found:

> "The search of the vehicle was undertaken specifically for the purpose of finding the drugs that the officers believed would be located in the vehicle or the purse based upon the illegally obtained information they had received from the informant."

Similarly, the trial court found that the primary basis for the arrest of Gralla was the illegally obtained information. There is evidence in the record to support those findings of fact;

---

[7] At that point, the officers exceeded the permissible scope of the traffic stop. *See State v. Dominguez-Martinez*, 321 Or 206, 212, 895 P2d 306 (1995) ("[A]n officer who stops a person for a traffic infraction may investigate only that infraction, unless the state can point to some basis other than the traffic infraction to broaden the scope of the investigation. * * * [A]fter the investigation reasonably related to the traffic infraction is complete, an officer does not have authority * * * to continue to detain the person stopped for the traffic infraction.").

accordingly, we will not disturb them. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Those facts justified suppression of the evidence as ordered by the trial court.

In summary, the Court of Appeals erred when it reversed the trial court's suppression orders.

The decision of the Court of Appeals is reversed. The orders of the circuit court, granting defendants' motions to suppress, are affirmed. The case is remanded to the circuit court for further proceedings.