Argued and submitted November 4, 2003, decision of Court of Appeals affirmed; judgment of circuit court reversed July 15, 2005

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## DAVID CLYDE HALL,
*Respondent on Review.*

### (CC 9701546CR; CA A109813; SC S49825)

115 P3d 908

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

* Appeal from Klamath County Circuit Court, Richard Rambo, Judge. 183 Or App 48, 50 P3d 1258 (2002).

Peter Gartlan, Chief Defender, Salem, argued the cause for respondent on review. With him on the briefs were Peter A. Ozanne, Executive Director, and Louis R. Miles, Deputy Public Defender, Office of Public Defense Services.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

CARSON, C. J.

Durham, J., concurred in part and dissented in part, and filed an opinion in which Gillette, J., joined.

---

** Kistler, J., did not participate in the consideration or decision of this case.

## CARSON, C. J.

In this criminal case, we decide two questions. First, under the circumstances at issue here, did the police encounter with defendant constitute an unlawful "stop" under ORS 131.615(1) (1995) and, consequently, also an unlawful "seizure" under Article I, section 9, of the Oregon Constitution?[1] Second, if so, did that unlawful stop vitiate defendant's consent to the subsequent search of his person?

The state charged defendant with possession of amphetamine, ORS 475.992(4)(b), based upon evidence that a police officer had seized during a consent search of defendant's person. The trial court denied defendant's pretrial motion to suppress the state's evidence, and a jury later convicted defendant of the charged offense. On defendant's subsequent appeal, a majority of the Court of Appeals, sitting en banc, reversed. It held that, notwithstanding the voluntariness of defendant's consent to the search, Article I, section 9, required exclusion of the challenged evidence because the police officer had stopped defendant unlawfully and then had "exploited" that unlawful stop to obtain defendant's consent. *State v. Hall*, 183 Or App 48, 50 P3d 1258 (2002). We allowed the state's petition for review. For the reasons that follow, we affirm the decision of the Court of Appeals and reverse the judgment of the trial court.

---

[1] ORS 131.615(1) (1995), *amended by* Oregon Laws 1997, chapter 866, section 1, provided, in part:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

The 1997 Legislative Assembly amended that statute to provide that an officer also may stop a person to make a reasonable inquiry if the officer reasonably suspects that that person "is about to commit a crime[.]" Or Laws 1997, ch 866, § 1. That amendment does not apply to this proceeding.

Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

## I. FACTS AND PROCEDURAL BACKGROUND

■■ Our review of the trial court's denial of defendant's pretrial suppression motion is limited to issues of law. We are bound by the trial court's findings of historical fact if constitutionally sufficient evidence in the record supports those findings. *State v. Boone*, 327 Or 307, 309, 959 P2d 76 (1998). If the trial court did not make express findings respecting all pertinent historical facts, and the record contains conflicting evidence, then we presume that the trial court found facts that were consistent with its ultimate conclusion. *State v. Stevens*, 311 Or 119, 126-27, 806 P2d 92 (1991). With those precepts in mind, we take the following facts from the trial court's written findings and from the record.

At approximately 4:00 p.m. on January 8, 1997, Klamath Falls Police Officer Deese saw defendant walking along Washington Street near Tenth Street in Klamath Falls. Deese was in uniform and was driving a marked police vehicle. As Deese drove past defendant, he noticed defendant twice glance towards him and then quickly look away. After he had passed defendant, Deese observed in his rear-view mirror that defendant had turned around to look at him several more times.

Based upon those observations, Deese turned his vehicle around and drove back towards defendant. Without activating his overhead lights or blocking defendant's way, Deese stopped his vehicle next to defendant and then motioned with two fingers for defendant to approach him. When defendant neared, Deese got out of his vehicle and asked defendant if he had any personal identification. Defendant handed Deese an identification card, which Deese used to radio the police dispatch for a warrant check relating to defendant.

After he had radioed the police dispatch, but before he had received back any information, Deese returned the identification card to defendant. Deese noticed that defendant appeared to be carrying something inside his jacket and asked defendant if he was carrying any weapons, knives, or illegal drugs. Defendant replied that he was not. Deese asked defendant if he minded if Deese searched him, and defendant

responded "no, go ahead." After patting down the exterior of defendant's jacket, Deese reached into defendant's jacket pocket, pulled out a small glass vial, and opened it. Based upon the smell and the appearance of white residue inside that vial, Deese concluded that the vial contained methamphetamine, and he arrested defendant for possession of a controlled substance. Subsequent testing established that the vial contained traces of amphetamine.

Before trial, relying upon ORS 131.615(1) (1995), Article I, section 9, and the Fourth Amendment to the United States Constitution,[2] defendant moved to suppress the evidence of the vial and its contents upon the ground that that evidence was the fruit of an unlawful police stop.[3] He also contended that suppression was required because he had not consented to the search voluntarily. After a hearing at which both Deese and defendant testified, the trial court denied defendant's motion, concluding that Deese's encounter with defendant had not amounted to a stop and that defendant's consent to the subsequent search had been voluntary.[4] As

---

[2] The text of both ORS 131.615(1) (1995) and Article I, section 9, is set out at 339 Or at 9 n 1. The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 US 643, 655, 81 S Ct 1684, 6 L Ed 2d 1081 (1961).

[3] Defendant originally was indicted in case number 97-0081-CR, and, following a hearing, the trial court denied defendant's pretrial suppression motion in that case. Subsequently, on the state's motion, the court dismissed that indictment without prejudice, because the indictment erroneously had charged defendant with possession of methamphetamine, rather than amphetamine. The state then charged defendant with possession of amphetamine in case number 97-1546-CR. Because the trial court already had heard and denied defendant's suppression motion relating to the vial in case number 97-0081-CR, the trial court in case number 97-1546-CR declined to rehear that motion and, instead, adhered to the same ruling after taking judicial notice of the record from the first suppression hearing.

[4] Specifically, in its letter ruling, the trial court stated:

"This case is similar to *State ex rel [Juv.] Dept. v. Fikes*, 116 Or App 618[, 842 P2d 807] (1992). For the reasons set forth therein, Defendant's Motion to Suppress is denied."

In *Fikes*, 116 Or App at 623-24, the Court of Appeals held that a youth had not been "stopped" under ORS 131.615 (1991), *amended by* Oregon Laws 1997, chapter 866,

noted, after a trial, a jury found defendant guilty of the charged offense.

Defendant appealed. Before the Court of Appeals, defendant did not challenge the trial court's ruling that his consent to the search had been voluntary. Instead, he argued only that the state's evidence was inadmissible because it had derived from an unlawful police stop.[5]

Sitting en banc, a majority of the Court of Appeals reversed. Contrary to the trial court, the Court of Appeals unanimously concluded that Deese unlawfully had stopped defendant without reasonable suspicion of criminal activity. *Hall*, 183 Or App at 56, 62. In considering the effect of that illegality upon the admissibility of the evidence from the consent search that followed, that court also unanimously agreed that, notwithstanding the voluntariness of defendant's consent, Article I, section 9, required the court to exclude the state's evidence if that evidence had derived from "exploitation" of the unlawful stop. *Id.* at 58, 63. In deciding whether the state's evidence in fact had derived from "exploitation" of that prior illegality, however, the court divided over both the applicable analysis and the result.

According to the majority opinion, whether evidence from a consent search derives from exploitation of prior unlawful police conduct[6] depends upon whether the police gained information from that illegality that provided the impetus for the police to seek the defendant's consent. *Id.* at 58 n 8, 59. Specifically, reaffirming the test articulated in

section 1, or "seized" under Article I, section 9, or the Fourth Amendment when a police officer had approached that youth on the street and had asked that youth for consent to search his person. The court further held that the subsequent search had been lawful because the youth voluntarily had given his consent to the search. *Id.* at 624-25.

[5] Before the Court of Appeals, defendant also assigned error to the trial court's denial of his motion to dismiss for lack of a speedy trial under ORS 135.747 and Article I, section 10, of the Oregon Constitution. The Court of Appeals rejected that assignment of error without discussion, *Hall*, 183 Or App at 50, and defendant did not petition this court for review of that part of the Court of Appeals decision.

[6] In *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), this court used the phrase "unlawful police conduct" as shorthand to describe a governmental act that violated a defendant's rights under Article I, section 9. *See id.* at 38 n 12 (so noting). Throughout this opinion, when we use that same phrase, we use it for that same meaning.

that court's decision in *State v. Stanley*, 139 Or App 526, 912 P2d 948 (1996), *rev'd on other grounds*, 325 Or 239, 935 P2d 1202 (1997), the majority opinion explained that "exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts [the police] either to seek the defendant's consent or to ask questions leading to consent." *Hall*, 183 Or App at 60 (quoting *Stanley*, 139 Or App at 535; internal quotation marks omitted). In this case, the majority opinion determined that Deese had "exploited" the unlawful stop because that stop had allowed Deese to observe bulges in defendant's jacket, which, in turn, had prompted his request for defendant's consent to the search. *Id.* at 59. Based upon that determination, the majority opinion held that the trial court had erred by admitting the challenged evidence, and it reversed the trial court's judgment.[7] *Id.*

The dissent disagreed, taking issue both with the majority opinion's explanation of the nature of the court's inquiry in determining "exploitation" and with its application of that analysis to the facts of this case. In the dissent's view, whether evidence derives from police exploitation of a prior illegality is a fact-specific inquiry that depends upon the nature of the causal connection between the unlawful police conduct and the evidence sought to be suppressed. *Id.* at 67 (Deits, C. J., dissenting). By contrast to the majority opinion's focus upon whether the illegality affected the officer's actions, the dissent asserted that an exploitation analysis concerns whether a prior illegality affected the defendant's decision to consent. *Id.* at 72 (Deits, C. J., dissenting). Although stressing that no "bright-line" rule exists, the dissent identified a number of factors that it considered relevant to that determination, including (1) a "but-for" causal connection between the unlawful police conduct and the evidence sought to be suppressed; (2) whether the police had obtained information only by virtue of unlawful conduct, and whether

---

[7] Judge Brewer joined the majority opinion in holding that Article I, section 9, required the exclusion of the state's evidence. He, however, authored a separate concurring opinion to state his agreement with the dissent that a defendant's reasons for consenting also may be relevant to the determination whether evidence procured during an otherwise valid consent search is inadmissible because of police exploitation of a prior illegality. *Hall*, 183 Or App at 61-62 (Brewer, J., concurring).

the defendant's knowledge that the police had such informa-
tion had been a substantial factor in the defendant's decision
to consent; (3) the presence of intervening circumstances sep-
arating the unlawful police conduct from the evidence sought
to be suppressed; and (4) the temporal proximity between the
unlawful police conduct and the defendant's consent. *Id.* at
71 (Deits, C. J., dissenting). Because the trial court had not
reached the question of exploitation in this case, the dissent
would have remanded the case to the trial court for that court
to determine whether the state's evidence had derived from
exploitation of the unlawful stop in light of the above-
described considerations. *Id.* at 75 (Deits, C. J., dissenting).

The state petitioned this court for review, and we
allowed that petition. On review, the state first argues that
Deese's encounter with defendant did not amount to an
unlawful stop. Secondly, the state argues that, even if Deese
unlawfully had stopped defendant, the challenged evidence
was not subject to suppression under Article I, section 9,
because defendant voluntarily had consented to the search
and defendant's voluntary act of consenting—not the unlaw-
ful stop—had been the source of the evidence from that
search. In making that second argument, the state asks that
we reconsider this court's prior case law holding that a viola-
tion of a defendant's rights under Article I, section 9, may
affect the admissibility of evidence from a consent search
even when the voluntariness of the defendant's consent is not
at issue. *See, e.g., State v. Rodriguez,* 317 Or 27, 38-42, 854
P2d 399 (1993) (explaining same).

For the reasons that follow, we conclude that Deese's
encounter with defendant constituted an unlawful stop
under ORS 131.615(1) (1995) and, consequently, also an
unlawful "seizure" under Article I, section 9. We further
decline the state's invitation to depart from this court's prec-
edents and, instead, reaffirm that a violation of a defendant's
rights under Article I, section 9, may vitiate a defendant's
otherwise voluntary consent to a search. Finally, under the
facts of this case, we conclude that the state failed to satisfy
its burden in showing that defendant's consent was suffi-
ciently independent of the preceding unlawful stop. Based
upon those conclusions, we affirm the decision of the Court of
Appeals and reverse the judgment of the trial court.

## II. DISCUSSION

As noted above, defendant's pretrial suppression motion relied upon ORS 131.615(1) (1995), Article I, section 9, and the Fourth Amendment. Because we resolve this case on state law grounds, we do not reach defendant's federal constitutional claim. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers all questions of state law before reaching federal constitutional claims).

### A. *Applicable Oregon Law*

In Oregon, both statutory and constitutional law limit the authority of police to detain citizens. ORS 131.615(1) (1995), the statutory provision at issue here, provided that a police officer temporarily may restrain, or "stop,"[8] a person only when the officer "reasonably suspects that [that] person has committed a crime[.]" Article I, section 9, protects "the right of the people to be secure * * * against unreasonable search, or seizure[.]"

Unless a defendant's constitutional claims could result in more complete relief, this court generally begins its analysis by first considering a defendant's statutory claims. *See State v. Harberts*, 331 Or 72, 81, 11 P3d 641 (2000) (so stating); *see also, e.g., State v. Jacobus*, 318 Or 234, 864 P2d 861 (1993) (considering whether police encounter was lawful under statutory law before considering state constitutional claims). Previously, as with constitutional limits on police authority, this court has given effect to statutes defining police authority to seize or search a person by denying the state the use of any evidence that it obtained in violation of such provisions. *See State v. Davis*, 295 Or 227, 236-37, 666 P2d 802 (1983) (so stating); *see also, e.g., State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998) (suppressing evidence obtained in violation of ORS 810.410(3)(b) (1993), *amended by* Oregon Laws 1999, chapter 1051, section 89). Because that prior decisional law mandates such a remedy for any statutory violations in this case,[9] we begin our analysis by considering

---

[8] ORS 131.605(5) defines the meaning of the term "stop," contained in ORS 131.615(1) (1995), as "a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

[9] In 1997, the legislature passed Senate Bill (SB) 936 (1997), which contained a provision, now codified at ORS 136.432, that limits the exclusion of evidence as

defendant's statutory claim. In doing so, however, we observe that defendant does not contend that his rights under ORS 131.615(1) (1995) are different from, or greater than, his rights under Article I, section 9. This court also previously has explained that the analysis under ORS 131.615 (1995) and Article I, section 9, is substantially the same.[10] *See Toevs*, 327 Or at 534 (so stating). Thus, we consider whether Deese's encounter with defendant violated ORS 131.615(1) (1995) and whether exclusion of the state's evidence is required in light of this court's Article I, section 9, jurisprudence. *See id.* (following same approach).

B. *Lawfulness of Police Encounter with Defendant under Oregon Law*

■ Because defendant challenged the admissibility of the state's evidence upon the ground that it derived from an unlawful police stop, we begin our analysis by considering the lawfulness of Deese's encounter with defendant. This court has identified three general categories of encounters between police officers and citizens. *See State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (so stating). The first category, "mere conversation" encounters, encompasses consensual interactions between police officers and citizens that

---

an available remedy for violations of statutory provisions. Or Laws 1997, ch 313, § 1. Because defendant committed his crime on January 8, 1997, and because the *ex post facto* clause in Article I, section 21, of the Oregon Constitution precludes the application of ORS 136.432 to crimes committed before its effective date of June 12, 1997, we do not consider the effect of ORS 136.432 here. *See* Or Laws 1997, ch 313 (providing effective date of June 12, 1997); *State v. Fugate*, 332 Or 195, 215, 26 P3d 802 (2001) (*ex post facto* clause in Article I, section 21, precludes application of exclusionary limits contained in SB 936 to crimes committed before its effective date).

[10] We acknowledge that, by requiring the police to have a reasonable suspicion that the person "has committed a crime[,]" ORS 131.615(1) (1995) imposed greater restrictions upon police authority to stop a person than does Article I, section 9. *See State v. Cloman*, 254 Or 1, 6, 456 P2d 67 (1969) (to stop person, police must have reasonable suspicion that person "[has] a connection with criminal activity"); *see also State v. Valdez*, 277 Or 621, 625 n 4, 561 P2d 1006 (1977) (observing that, although ORS 131.615 (1973) attempted to codify *Cloman*, 254 Or 1, and *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), statute adopted narrower rule because legislature omitted words "or is about to commit [a crime]" from final text of statute). As discussed further below, 339 Or at 17, however, that difference is of no consequence here, because the parties do not dispute that Deese lacked a reasonable suspicion that defendant either had been involved in, or was about to become involved in, any criminal activity at the time of the encounter at issue in this case.

require no justification and that do not implicate Article I, section 9. *Id.* The second category, temporary restraints of a person's liberty for investigatory purposes—or "stop[s]" under ORS 131.615(1) (1995)—constitutes a type of "seizure" of a person under Article I, section 9, that must be justified by a reasonable suspicion of criminal activity. *Id.* The third category, arrests, also constitutes a "seizure" of a person under Article I, section 9, and must be justified by probable cause to believe that the person arrested has committed a crime. *Id.*

■■ As noted above, 339 Or at 11-12 n 4, the trial court concluded that Deese's encounter with defendant had been a consensual interaction that had not restrained defendant's liberty in a manner that implicated Article I, section 9. Although we are bound by the trial court's findings of historical fact if constitutionally sufficient evidence in the record supports those findings, we must assess independently whether those findings support the trial court's legal conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In this case, we note at the outset that the state concedes, and we agree, that Deese's observations of defendant repeatedly turning to look at Deese's patrol vehicle and then averting his gaze did not give rise to a reasonable suspicion that defendant was engaged in any criminal conduct.[11] Thus, if Deese's encounter with defendant constituted a "stop" under ORS 131.615(1) (1995), then that encounter was unlawful, because it was not justified by the requisite level of concern respecting possible criminal activity. The question before us, then, is whether the trial court correctly ruled that Deese's encounter with defendant did not amount to a stop.

■■■ In *Holmes*, 311 Or at 409-10, this court held that a "seizure" of a person under Article I, section 9, occurs when either (1) a police officer intentionally and significantly interferes with a person's liberty of movement; or (2) a person believes that his or her liberty of movement has been so restricted and such a belief is objectively reasonable under the circumstances. Police conduct interfering with a person's liberty of movement may take the form of either physical

---

[11] ORS 131.605 defines the term "reasonably suspects" as "a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts * * *."

force or a show of authority. *State v. Juarez-Godinez*, 326 Or 1, 6, 942 P2d 772 (1997). In deciding whether police conduct implicates Article I, section 9, the pivotal consideration is whether "the officer, even if making inquiries a private citizen would not, has otherwise conducted [himself or herself] in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *Holmes*, 311 Or at 410. The determination whether a person has been "seized" under Article I, section 9, requires a fact-specific inquiry examining the totality of the circumstances in the particular case. *Id.* at 408.

This court's prior case law provides useful guidance as to whether Deese's encounter with defendant constituted a stop. In *State v. Warner*, 284 Or 147, 585 P2d 681 (1978), a police officer approached the defendant as he was leaving a tavern and asked the defendant if he would return inside. *Id.* at 150-51. The defendant complied with the officer's request, and, once inside the tavern, the officer asked the defendant to place his identification card on a table. *Id.* at 151-52. After the defendant did so, the officer explained to the defendant that the officer was investigating a robbery, and he advised the defendant that "[the defendant] would be on [his] way" as soon as the officer was satisfied that the defendant had no involvement in that crime. *Id.* at 152. On review, this court held that, at the moment that the officer told the defendant to place his identification card on the table and advised the defendant that he was the subject of a criminal investigation, the officer had seized the defendant by a show of authority for purposes of ORS 131.615 (1975), *amended by* Oregon Laws 1997, chapter 866, section 1, and Article I, section 9. *Id.* at 165.

In *State v. Painter*, 296 Or 422, 676 P2d 309 (1984), a police officer approached the defendant on the street and requested to see the defendant's identification. The defendant responded to the officer's request by handing the officer both an expired driver license and several credit cards. While still retaining those items, the officer ran a warrant check and questioned the defendant about the location of his vehicle. *Id.* at 424. On review, this court held that the officer had

seized the defendant when the officer had retained the defendant's identification cards because that action had the practical effect of making the defendant unable to leave. *Id.* at 425.

■ ■ Under the facts of this case, we similarly conclude that Deese's encounter with defendant here constituted a "stop" under ORS 131.615(1) (1995). In this case, Deese's initial actions of stopping his vehicle next to defendant and then gesturing for defendant to approach him did not intrude upon defendant's liberty of movement, because, even if Deese inconvenienced defendant, his actions did not constitute a show of authority involving conduct "significantly beyond that accepted in ordinary social intercourse." *Holmes*, 311 Or at 410. When Deese took defendant's identification card and radioed the police dispatch for a warrant check, however, the consensual nature of that encounter dissipated, and the encounter evolved from a "mere conversation" encounter into a restraint upon defendant's liberty of movement. It is true that, unlike the officers in *Warner* and *Painter*, Deese promptly returned defendant's identification card. Nevertheless, when Deese did so, defendant was cognizant that Deese was investigating whether defendant was the subject of any outstanding warrants. Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check. We further observe that, in this case, Deese did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until Deese had received the results of the warrant check. Instead, immediately upon returning defendant's identification card, Deese questioned defendant about whether defendant was carrying any weapons, knives, or illegal drugs, and he asked defendant for consent to search defendant's person.

Under those circumstances, we conclude that the trial court erred by ruling that Deese's encounter with defendant did not restrain defendant's liberty so as to constitute a "stop" under ORS 131.615(1) (1995). Because that restraint was not justified by a reasonable suspicion of criminal activity, we further conclude that that encounter violated both ORS 131.615(1) (1995) and Article I, section 9.

## C. *Admissibility of State's Evidence from Consent Search Following Illegal Stop under Oregon Law*

Having concluded that Deese's encounter with defendant was unlawful, we now must consider the effect of that illegality upon the admissibility of the state's evidence from the consent search that followed. In doing so, we first clarify the two related, but distinct, ways that a violation of a defendant's rights under Article I, section 9, may affect the validity of a defendant's subsequent consent to a search. *See generally State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994) (discussing general categories of challenges to consent searches).

■ First, illegal police conduct violating a defendant's rights under Article I, section 9, may negate a defendant's consent to a search upon the ground that that police conduct rendered the defendant's consent involuntary. *Id.* Although this court previously has stated that "the burden [of persuasion] on the police to show voluntariness when consent occurs after illegal police conduct is greater than when no illegality has occurred[,]" *State v. Kennedy*, 290 Or 493, 502, 624 P2d 93 (1981), we reiterate here that the state's burden of persuasion in establishing the voluntariness of a defendant's consent under Article I, section 9, does not vary according to the lawfulness of the circumstances in which the defendant's consent was obtained. *See Stevens*, 311 Or at 136-37 (defining state's burden in voluntariness inquiry under Article I, section 9). Instead, as a threshold matter in *any* case in which the state relies upon a defendant's consent to validate a warrantless search, the state must prove by a preponderance of the evidence that the defendant's consent was voluntary. *Id.* In deciding whether the state has satisfied that burden for the purposes of Article I, section 9, the test is whether, under the totality of the circumstances, the defendant's consent was an act of free will or, instead, resulted from police coercion, either express or implied. *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983).

■ Although unlawful police conduct does not alter the state's burden in establishing the voluntariness of a defendant's consent, the effect of that unlawful conduct upon the

defendant's capacity to exercise his or her free will is one circumstance that may be relevant to the decision whether the defendant's consent was voluntary for purposes of Article I, section 9. *Rodriguez*, 317 Or at 38-39. In some instances—for example, when a defendant consented in acquiescence to a claim of lawful police authority—the court's determination as to the lawfulness of the police conduct may bear directly upon its determination of the voluntariness of the defendant's consent. *See, e.g., State v. Williamson*, 307 Or 621, 626-27, 772 P2d 404 (1989) (Carson, J., concurring) (defendant's consent to search involuntary when given in response to false claim of authority); *State v. Hirsch*, 267 Or 613, 622, 518 P2d 649 (1974) (" 'If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable.' " (quoting *State v. Douglas*, 260 Or 60, 81, 488 P2d 1366 (1971) (O'Connell, C. J., dissenting)). In other circumstances, however, prior unlawful police conduct may bear upon the court's voluntariness inquiry under Article I, section 9, because that police conduct, irrespective of any determination as to its illegality, had the effect of coercing the defendant's consent. *See Rodriguez*, 317 Or at 38, 38 n 13 (noting same).

In addition to affecting the voluntariness of a defendant's consent, this court also has recognized a related, but independent, reason why police conduct violating a defendant's rights under Article I, section 9, may vitiate a defendant's subsequent consent to a search. Specifically, similarly to the United States Supreme Court's holding in *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 411 (1963), that a defendant's voluntary statements may be the inadmissible "fruits" of a prior Fourth Amendment violation, this court has held that Article I, section 9, may require exclusion of evidence from an otherwise valid consent search upon the ground that the defendant's consent derived from a preceding violation of the defendant's rights under that state constitutional provision. *See, e.g., Rodriguez*, 317 Or at 38-42 (so stating). In *Rodriguez*, again similarly to the Supreme Court in *Wong Sun*, this court described that second inquiry as an "exploitation" inquiry.[12] *Id.*

---

[12] In *Wong Sun*, the Supreme Court refined the "fruit of the poisonous tree" doctrine that is applicable under the Fourth Amendment exclusionary rule, stating:

As discussed above, in the present case, defendant has not challenged the trial court's ruling that the state established the voluntariness of his consent. Thus, the only issue before us is whether Article I, section 9, requires exclusion of the state's evidence because defendant's consent derived from—or, stated differently, was obtained by "exploitation" of—the unlawful stop. We turn to the state's arguments concerning that issue now.

The state contends that, in the context of a consent search, an "exploitation" inquiry serves only two functions—that is, to ensure that a defendant's consent is truly voluntary and to deter unlawful police conduct. Based upon that premise, the state asserts that, because the exclusionary rule for violations of Article I, section 9 (hereafter "Oregon exclusionary rule") is not predicated upon the same deterrence rationale as the Fourth Amendment exclusionary rule, this court has erred in concluding that evidence obtained as a result of a defendant's voluntary act—such as a defendant's voluntary grant of consent to a search—similarly may be rendered inadmissible under the Oregon exclusionary rule by a prior violation of the defendant's rights under Article I, section 9. According to the state, unless unlawful police conduct caused the defendant's consent to be involuntary, such conduct does not affect the admissibility of evidence from a consent search under the Oregon exclusionary rule, because a

---

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

371 US at 487-88 (quoting Maguire, *Evidence of Guilt*, 221 (1959)). Although *Wong Sun* concerned the admissibility of inculpatory statements that two defendants had made after illegal arrests, the Supreme Court appears to have applied that same reasoning in deciding the admissibility of evidence from a consent search following a violation of the defendant's rights under the Fourth Amendment. *See Florida v. Royer*, 460 US 491, 507-08, 103 S Ct 1319, 75 L Ed 2d 229 (1983) ("Because we affirm the * * * conclusion that [the defendant] was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search."). Lower federal courts also have presumed that the analysis from *Wong Sun* and its progeny concerning the admissibility of confessions under the Fourth Amendment exclusionary rule, *see, e.g., Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), applies equally in the context of consent searches. *See, e.g., United States v. Melendez-Gonzalez*, 727 F 2d 407 (5th Cir 1984).

defendant's voluntary act of consenting necessarily operates as an independent source for any evidence that is procured in a search based upon that consent.

To explain our disagreement with the state's contention that an "exploitation" inquiry in the context of an otherwise valid consent search is incompatible with the Oregon exclusionary rule, we begin by describing the objective—and consequently also the operation—of that rule. *See State ex rel Juv. Dept. v. Rogers*, 314 Or 114, 118-19, 836 P2d 127 (1992) (applicability of Oregon exclusionary rule determined in light of reasons for that rule). In doing so, we think it helpful first to contrast that rule with the Fourth Amendment exclusionary rule.[13]

Although its earlier decisions sometimes suggested other considerations at work, the United States Supreme Court for many years consistently has identified deterrence of unlawful police conduct as the primary purpose underlying the exclusionary rule for violations of the Fourth Amendment. *See United States v. Leon*, 468 US 897, 905-06, 104 S Ct 3405, 82 L Ed 2d 677 (1984) (identifying deterrence function as basis of Fourth Amendment exclusionary rule, but acknowledging that Court's prior decisions sometimes implied that exclusionary rule was necessary corollary of Fourth Amendment). In so holding, the Supreme Court has characterized the Fourth Amendment exclusionary rule as a judicially created remedial device that applies to only those circumstances in which its remedial objectives most efficaciously will be served. *See United States v. Calandra*, 414 US 338, 348, 94 S Ct 613, 38 L Ed 2d 561 (1974) (so stating). Based upon that theory, the Supreme Court has defined the breadth of the Fourth Amendment exclusionary rule by assessing whether the deterrence benefits in applying that rule outweigh the costs of excluding otherwise admissible evidence. *See Leon*, 468 US at 909-10 (noting that analytical approach).

---

[13] For an overview of the history of the exclusionary rule under the Fourth Amendment and under Article I, section 9, see generally Ronald W. Messerly, *Development of the Right to Exclude Illegally Seized Evidence in Oregon under Article I, section 9 of the Oregon Constitution*, 25 Willamette L Rev 697 (1989).

■■ As the state correctly recognizes, this court, by contrast, explicitly has rejected the view that the Oregon exclusionary rule is predicated upon a deterrence rationale. *Davis*, 295 Or at 233-37. Instead, this court has held that the Oregon exclusionary rule is a constitutionally mandated rule that serves to vindicate a defendant's personal rights. In other words, the right to be free from unreasonable searches and seizures under Article I, section 9, also encompasses the right to be free from the use of evidence obtained in violation of that state constitutional provision.[14] *See State v. Davis*, 313 Or 246, 249, 834 P2d 1008 (1992) (so stating). In that vein, this court has explained that the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if "the government's officers had stayed within the law." *Davis*, 295 Or at 234. Thus, in deciding the applicability of the Oregon exclusionary rule, the critical inquiry is whether the state obtained the evidence sought to be suppressed as a result of a violation of the defendant's rights under Article I, section 9. *See, e.g., State v. Smith*, 327 Or 366, 379-80, 963 P2d 642 (1998) (holding evidence obtained following unlawful police conduct nevertheless admissible, because evidence not obtained by virtue of that unlawful conduct).

■■ Although the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if "the government's officers had stayed within the law," *Davis*, 295 Or at

---

[14] Before the Supreme Court held in *Mapp*, 367 US 643, that the Fourth Amendment exclusionary rule applies to the states, this court had approved of the use of that rule in Oregon state courts based upon its agreement with the Supreme Court in *Weeks v. United States*, 232 US 383, 34 S Ct 341, 59 L Ed 652 (1914), that such a rule was necessary to effectuate constitutional protections against unreasonable searches and seizures. *See State v. Laundy*, 103 Or 443, 494, 204 P 958, 206 P 290 (1922) (stating that Oregon state courts should apply exclusionary rule for same reasons that Supreme Court articulated in *Weeks*); *see also Davis*, 295 Or at 233-34 (noting same history of Oregon exclusionary rule). Although cases subsequent to *Laundy* sometimes suggested that the Oregon exclusionary rule might apply to deter future constitutional violations, in a sequence of cases beginning with *Davis*, 295 Or 227, this court reaffirmed its view that, although deterrence may be a benefit of the Oregon exclusionary rule, the constitutional basis for that rule is to vindicate the defendant's personal rights. *See, e.g., State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987) (personal rights); *State v. Tanner*, 304 Or 312, 315, 745 P2d 757 (1987) (same); *compare with State v. Quinn*, 290 Or 383, 397, 623 P2d 630 (1981) (stating exclusionary rule under Article I, section 9, should be applied only as broadly as necessary to accomplish its "prophylactic" purposes).

234, this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained "but for" unlawful police conduct. *See, e.g.*, *Rodriguez*, 317 Or at 40 (evidence not rendered inadmissible under Article I, section 9, because it would not have been obtained "but for" unlawful police conduct). Instead, as this court recently explained in *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003), after a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a "but for" relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9, *see, e.g.*, *Johnson*, 335 Or at 522-26 (discussing principle); (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9, *see, e.g.*, *Smith*, 327 Or at 379-80 (discussing principle); or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence, *see, e.g.*, *State v. Jones*, 248 Or 428, 433-34, 435 P2d 317 (1967) (discussing principle).

In each of those above-described circumstances, the admission of the challenged evidence does not offend Article I, section 9, because the defendant has not been disadvantaged as a result of the unlawful police conduct or, stated differently, because the defendant is not placed in a worse position than if the governmental officers had acted within the bounds of the law. In short, suppression of evidence in such circumstances would not serve to vindicate the defendant's rights under Article I, section 9, because the evidence sought to be suppressed did not result from a violation of the defendant's rights under Article I, section 9. *See State v. Sargent*, 323 Or 455, 462-63, 918 P2d 819 (1996) (evidence not subject

to suppression under Article I, section 9, if no causal connection between evidence sought to be suppressed and unlawful police conduct); *Rodriguez*, 317 Or at 39 (same).

As noted above, in the present case, the state contends that a defendant's voluntary act of consenting necessarily severs the causal link between evidence that the state obtains from a search based upon that consent and any antecedent violation of the defendant's rights under Article I, section 9. Starting from that premise, the state argues that the Oregon exclusionary rule does not require exclusion of evidence from a consent search whenever the defendant's consent is voluntary because the exclusion of evidence in such circumstances would not serve to vindicate the defendant's rights under Article I, section 9.

On the surface, the state finds some support for that position in this court's decision in *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), as well as its decisions in *Kennedy*, 290 Or 493, and *Rodriguez*, 317 Or 27. In each of those cases, this court concluded that the preceding violation of the defendant's rights under Article I, section 9, did not rob the defendant's consent of its efficacy as an independent justification for the search that produced the disputed evidence. Before examining those holdings in *Kennedy* and *Rodriguez*, we first dispel the idea that this court's Article I, section 9, holding in *Quinn* remains viable law.

In *Quinn*, 290 Or 383, the police discovered evidence that implicated the defendant in a murder solely as the result of an unlawful search of the defendant's vehicle. *Id.* at 387. Without informing the defendant of that discovery, the police sought and obtained the defendant's consent to search the vehicle a second time. *Id.* at 388. The police seized the previously discovered evidence pursuant to that second search, and, after being confronted with that evidence, the defendant eventually confessed to the murder. *Id.* at 388-89.

On review before this court, the defendant challenged the admissibility of evidence from the consent search under Article I, section 9. Purporting to embrace the analysis articulated in *Wong Sun*, 371 US 471, this court rejected the defendant's assertion that the evidence seized in the consent search had derived from the preceding unlawful search

because, although the police had sought the defendant's consent solely as a result of the inculpatory evidence discovered from the unlawful search, the defendant had been ignorant of that unlawful search at the time when he granted his consent.[15] *Id.* at 396. Notably, in reaching that holding, this court identified deterrence as the underlying purpose of the Oregon exclusionary rule and also stressed that the unlawful search had resulted from a good-faith police mistake about the state of the law. *Id.* at 397.

In his concurring opinion in *Weaver*, 319 Or at 222-24, Justice Gillette cautioned that this court's conclusion in *Quinn* "approach[ed] being (and it may in fact be) unsupportable." Specifically, in light of the fact that the police had sought the defendant's consent in *Quinn* only because of the discovery of inculpatory evidence during the preceding unlawful search, Justice Gillette opined that "[a] more direct exploitation of illegal government activity would be difficult to posit." *Id.* at 224. For the reasons explained below, we agree with that view and take this opportunity to overrule expressly that part of this court's decision in *Quinn*.

■ This court repeatedly has recognized that, even when a defendant's consent is voluntary—that is, when the defendant's free will has not been overcome by police coercion—that consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9. *See, e.g., Rodriguez*, 317 Or at 41-42 (examining whether defendant's voluntary consent resulted from illegal arrest); *State v. Dominguez-Martinez*, 321 Or 206, 214, 895 P2d 306 (1995) (concluding that evidence obtained from presumably voluntary consent search during illegal traffic stop was inadmissible). Unless the state is able

---

[15] A number of commentators have challenged the correctness of such a reading of *Wong Sun. See, e.g.*, Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, IV-88, § 8.2(d) (4th ed 2004) (arguing that, under *Wong Sun*, if "[a] prior illegal search provides a significant lead in terms of indicating what other evidence [the police] ought to seek or where they ought to seek it, * * * then a consent obtained by exploitation of that information would constitute a fruit of the earlier illegal search. This would be true * * * even if the consenting party were unaware of the earlier search."); Joseph G. Casaccio, *Illegally Acquired Information, Consent Searches, and Tainted Fruit*, 87 Colum L Rev 842 (1987) (stating same).

to make that showing, then the defendant's consent cannot operate to validate a warrantless search because the defendant's consent *itself* derived from a violation of the defendant's rights under that state constitutional provision. To not require suppression in such circumstances would be inconsistent with the previously described rationale underlying the Oregon exclusionary rule, that is, to place a defendant in the same position as if the governmental officers had acted within the bounds of the law. *See Rodriguez*, 317 Or at 39 ("There may be cases in which suppression of evidence obtained during a [voluntary] consent search may be necessary to vindicate a defendant's rights that were violated by earlier, unlawful police conduct.").

■　Although a showing of voluntariness alone is insufficient to establish the admissibility of evidence from a consent search following a violation of the defendant's rights under Article I, section 9, this court also has rejected the notion that any consent obtained after unlawful police conduct is invalid *per se*, no matter how tenuously related to that unlawful conduct. *See id.* at 39-40 (noting same). Instead, as discussed generally above, *see* 339 Or at 24-26 (discussing operation of Oregon exclusionary rule), the admissibility of evidence obtained in such circumstances is a fact-specific determination that depends upon the nature of the causal connection between the defendant's consent and the preceding violation of the defendant's rights under Article I, section 9. *See Rodriguez*, 317 Or at 39-40 (discussing same). In *Rodriguez*, this court framed that inquiry in this context by explaining that a causal connection requiring suppression exists "when the police take advantage of the circumstances of their unlawful conduct to obtain the [defendant's] consent to search." *Id.* at 40.[16] Although *Rodriguez* did not identify what factors to consider in making that determination, this court's Article I, section 9, jurisprudence offers some guidance. In cases decided since *Quinn*, one consideration that

---

[16] To the extent that the above-quoted statement from *Rodriguez* may be understood to suggest that a police officer's state of mind is relevant under Article I, section 9, we do not endorse it. *See State v. Ainsworth*, 310 Or 613, 621, 801 P2d 749 (1990) ("Article I, section 9, prohibits certain governmental action, not certain governmental states of mind. The Oregon Constitution does not require an inquiry into the observing officer's thoughts to determine whether the officer's conduct unconstitutionally violates a defendant's Article I, section 9, rights.").

emerges is whether the police sought the defendant's consent only as the result of knowledge of inculpatory evidence stemming from a prior unlawful search.

This court's decision in *State v. Carston*, 323 Or 75, 913 P2d 709 (1996), illustrates the application of that consideration.[17] In *Carston*, an informant had advised the police about a scheduled drug sale after he illegally intercepted a cordless telephone conversation between the codefendants. *Id.* at 78. The informant reported that a man had made arrangements to buy $300 of "really good stuff" and had informed the seller that he would be driving a four-door Suzuki. *Id.* Based upon that information, the police went to the residence where the drug transaction was scheduled to take place and then followed a four-door Suzuki as it drove away from that residence. *Id.* The police subsequently stopped that vehicle for a traffic violation and, during that stop, asked one of the defendants for his consent to search the vehicle. *Id.* at 79. The defendant granted his consent, and the police discovered drugs and drug paraphernalia in a closed container in the vehicle. *Id.* Based in part upon that evidence, the state charged the defendants with manufacture and delivery of a controlled substance, ORS 475.992.

Before trial, among other things, the defendants moved to suppress the evidence from the consent search. The trial court first determined that the initial stop of the vehicle had been lawful and that officer safety concerns had justified both a patdown search of the defendants and a limited search of the passenger compartment of the vehicle for weapons. *Id.* at 86. The trial court then went on to rule, however, that the evidence derived from the consent search nevertheless was inadmissible because, after assuring their safety, the officers had questioned the defendants about illicit drugs and had sought the defendant's consent to search solely based upon information illegally obtained by the informant. *Id.* On review, this court agreed with the trial court that, in light of that causal link between the defendant's consent and the prior unlawful search, suppression of the evidence was required. *Id.* at 86-87.

---

[17] Although *Carston* concerned a statutory violation, the reasoning in that opinion is equally applicable in this context.

Applying that same reasoning to the facts at issue in *Quinn*, it is apparent that—although capable of reconciliation with the deterrence rationale of the Fourth Amendment exclusionary rule—this court's conclusion in that case is untenable under Article I, section 9. Although the police in *Quinn* had conducted their first unlawful search of the defendant's vehicle under the mistaken belief that they were authorized to do so, the inculpatory evidence discovered during that search unquestionably derived from a violation of the defendant's rights under Article I, section 9. Solely as a result of that violation, the police then sought the defendant's consent to search his vehicle a second time in order to seize that previously discovered evidence. In light of that causal link between the violation of the defendant's rights under Article I, section 9, and the defendant's subsequent consent, the police cannot be said to have obtained the defendant's consent independently of their prior unlawful conduct, and, for that reason, that consent could not have operated as an independent justification for the search under Article I, section 9.

Having clarified why *Quinn* does not assist the state here, we now turn to this court's decisions in *Kennedy* and *Rodriguez*. By contrast to the facts at issue in *Quinn*, the governmental officers in *Kennedy* and *Rodriguez* did not seek the defendant's consent only as a result of knowledge of inculpatory evidence gained from a prior unlawful search. Instead, each case involved the more difficult question of the validity of a defendant's consent given during a purportedly unlawful seizure. As discussed below, contrary to other of its precedents, this court concluded in both cases that the violation of the defendant's rights under Article I, section 9, had not destroyed the efficacy of the defendant's consent to the search that produced the disputed evidence. We examine the basis of each of those holdings in more detail below.

In *Kennedy*, 290 Or 493, two police officers approached the defendant as he was preparing to exit the Portland airport and informed him that they had information that he might be in possession of illegal drugs. The defendant denied that allegation and then, without any prompting, asked the officers if they wished to search his luggage. *Id.* at 496. The officers accepted his invitation and subsequently

discovered a small vial with cocaine residue in the defendant's bag. *Id.*

On review, after assuming that the police interaction with defendant had been unlawful, this court determined that the evidence of the vial nevertheless was admissible based upon "the absence of any coercive circumstances surrounding [the] defendant's consent, and [the] defendant's volunteering of consent, with no request by the police." *Id.* at 506. In reaching that conclusion, this court stated that the validity of the defendant's consent in such circumstances hinged upon only a determination of voluntariness, but added that the state faced a higher burden in establishing voluntariness when the defendant's consent followed unlawful police conduct. *Id.* at 502. Although we reject that formulation, *see* 339 Or at 20-21, we do not quarrel with the underlying concern that it expresses—namely, that Article I, section 9, requires a careful examination of the causal connection between a preceding illegality and the defendant's consent when the police gain a defendant's consent after unlawful police conduct. Although framing that issue as one concerning "exploitation," this court confirmed the necessity of such an inquiry in its decision in *Rodriguez*.

In *Rodriguez*, 317 Or 27, after presenting the defendant with an arrest warrant that may have been unlawful, the governmental agent warned the defendant of his rights to remain silent and to have counsel, and then asked the defendant whether he had any drugs or guns in his apartment. The defendant responded to that question by stating "No, go ahead and look." *Id.* at 30. When the agent questioned the defendant whether he had intended to authorize a search, the defendant repeated his willingness to allow the officers to search his apartment, and the agents subsequently discovered two guns. *Id.*

On review, after again assuming that the defendant's arrest had been unlawful, this court concluded that suppression of the guns nevertheless was not required under Article I, section 9. After clarifying that the voluntariness of the defendant's consent was *not* in question, this court explained that the issue, instead, was whether the defendant's consent had derived from—or, in the words of

*Rodriguez*, had been obtained by "exploitation" of—the preceding purportedly unlawful seizure. *Id.* at 38-40. In answering that question in that case, this court examined the circumstances of the seizure and observed that the defendant spontaneously had offered his consent to the search. *Id.* at 41. Although the court recognized that, but for the unlawful arrest, the agent would not have been in a position to accept the defendant's offer to allow a search, this court concluded that that causal connection alone was too tenuous to require suppression. *Id.*

Even if rejecting the state's view that voluntariness alone is sufficient to establish the admissibility of evidence from a consent search following an unlawful seizure, the above-described conclusion in *Rodriguez*, like the conclusion in *Kennedy*, could be viewed as supporting the state's position that suppression is not required in this case. Similarly to both *Kennedy* and *Rodriguez*, there is no evidence that Deese observed any sign of criminal conduct during his illegal detention of defendant that led to his request for defendant's consent to a search.[18] This court's decisions in *Kennedy* and *Rodriguez*, however, do not stand for the proposition that suppression is required only if the unlawful police conduct had allowed the discovery of inculpatory evidence that led to a request for consent. Instead, this court's case law both before and after *Rodriguez* makes clear that Article I, section 9, also requires the consideration of the effect of the unlawful police conduct upon the defendant's decision to consent, even if that conduct did not rise to the level of overcoming the defendant's free will. Several cases illustrate how this court has applied that consideration.

Although it was based upon Fourth Amendment precedents, this court's decision in *State v. Olson*, 287 Or 157, 598 P2d 670 (1979), is on point. In that case, the defendant made inculpatory statements to the police after officers had

---

[18] As discussed previously, 339 Or at 13, the majority opinion from the Court of Appeals determined that Deese had "exploited" the unlawful stop because that stop had allowed him to observe bulges in defendant's jacket. The record, however, does not support a finding that anything about those bulges (which had resulted from defendant's mittens) revealed any criminal conduct. For that reason, we disagree with the majority opinion from the Court of Appeals that Deese's observation of the bulges in defendant's jacket is significant in this case.

made a forcible nighttime entry into his residence and arrested him. After determining that both the entry and the subsequent arrest has been unlawful, this court concluded that the state had failed to show that those statements had not derived from that preceding unlawful police conduct and, for that reason, concluded that the statements were inadmissible under Article I, section 9.

This court reached a similar conclusion in *Dominguez-Martinez*, 321 Or 206.[19] After lawfully stopping the defendant for making unsignaled lane changes, the officer tested the turn signals on the defendant's vehicle and discovered that one of them was defective. *Id.* at 208. Rather than issue a citation, the officer instructed the defendant to repair the signal and then advised the defendant that he was free to go. *Id.* After making that statement, however, the officer continued to stand with his arm on the door of the defendant's vehicle and then asked for the defendant's consent to search the vehicle. *Id.* at 208-09. The defendant agreed, and the officer subsequently discovered illegal drugs in the vehicle. *Id.* at 209. On review, after finding that the officer had exceeded his statutory authority to detain the defendant, this court rejected the state's argument that, under the facts of that case, the defendant's voluntary consent nevertheless established the admissibility of the evidence from the search. *Id.* at 214.

This court's decision in *Toevs*, 327 Or 525, offers a final example.[20] In that case, the officers stopped the defendant for driving at night without the use of headlights. After running a records check and instructing the defendant to turn on his lights, the officer advised the defendant that he was free to go. *Id.* at 529. After making that statement, however, the officer then immediately asked the defendant for his consent to search the vehicle and questioned the defendant about whether he was carrying any illegal drugs. *Id.* The defendant initially withheld his consent to a search, but, after further questioning, he admitted to the officers that he

---

[19] Although *Dominguez-Martinez* concerned a statutory violation, the reasoning in that opinion is equally applicable in this context.

[20] *Toevs* also concerned a statutory violation, but the reasoning in that opinion is equally applicable in this context.

was in possession of drugs. *Id.* On review, this court determined that the officer unlawfully had seized the defendant at the time that he requested the defendant's consent and questioned the defendant. *Id.* at 537. Without considering voluntariness, this court further determined that, under the facts of that case, that illegality required the suppression of the evidence discovered as a result of the defendant's statements. *Id.* at 537-38.

As the above-described cases illustrate, this court's conclusions in *Kennedy* and *Rodriguez* that suppression was not required to vindicate those defendants' rights must be understood in light of the specific facts of each of those cases—particularly, the facts that those defendants both had volunteered to allow a search without any police prompting and, in *Rodriguez*, that the police had provided the defendant with *Miranda* warnings before questioning him about drugs or weapons. In the absence of such intervening circumstances—or other circumstances mitigating the effect of the unlawful police conduct—this court has required suppression under facts similar to those at issue in *Kennedy* and *Rodriguez. See, e.g., State v. Amaya,* 336 Or 616, 627, 89 P3d 1163 (2004) (explaining necessity of considering legality of stop in deciding admissibility of defendant's presumably voluntary statements by stating that, "if [the officer] had seized [the] defendant in violation of her Article I, section 9, rights before he questioned her about the bag, then his questions about the bag also were unlawful, and the evidence that the state obtained as a result of those questions must be suppressed"); *State v. Morton,* 326 Or 466, 470, 953 P2d 374 (1998) (when defendant dropped container only after police had begun taking defendant into custody, "the state cannot separate the act of arrest from the dropping of the container; the seizure [of the container] can be proper only if the arrest itself was authorized by a valid warrant"); *compare with Douglas,* 260 Or 60 (regardless of legality of police conduct, no suppression is required when defendant granted his consent in response to prompting by his brother-in-law, rather than police actions).

 With that background in mind, we return to this case. In doing so, we first summarize our preceding discussion: After a defendant shows a minimal factual nexus

between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct.[21] With those considerations in mind, we now decide whether the state has satisfied its burden in this case.

---

[21] As noted previously, the dissenting opinion from the Court of Appeals identified some of those same considerations. *See Hall*, 183 Or App at 71-72 (Diets, C. J., dissenting). In *Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), the United States Supreme Court also identified some of those considerations as relevant to deciding the admissibility of a defendant's voluntary statements following a Fourth Amendment violation. *See id.* at 603-04 (in deciding whether Fourth Amendment exclusionary rule requires suppression of defendant's voluntary statements following unlawful arrest, court should consider whether police provided defendant with *Miranda* warnings, along with "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct"). As discussed previously, 339 Or at 23-25, the *Brown* factor of "purpose and flagrancy of the official misconduct" relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9. The other considerations that the Supreme Court identified in *Brown*—namely, whether the police had provided the defendant with *Miranda* warnings (or, in the case of a consent search, with a warning that the defendant had the right to refuse consent), the temporal proximity between the illegality and the defendant's confession or consent, and the presence of

■ In our view, the circumstances at issue here more closely resemble the circumstances at issue in *Dominguez-Martinez* and *Toevs*, rather than the circumstances at issue in *Kennedy and Rodriguez*. Similarly to the defendants in *Dominguez-Martinez* and *Toevs*, defendant here consented to the search during an unlawful stop. Unlike the defendants in *Rodriguez* and *Kennedy*, defendant's grant of consent was not spontaneous but, instead, was made only in response to Deese's request that defendant allow a search. Deese made that request immediately after he had questioned defendant about whether defendant was carrying any weapons or illegal drugs and while he was waiting for the results of defendant's warrant check. Given the close temporal proximity between the illegal detention and defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct, we cannot say that the state has proved that defendant's decision to consent, even if voluntary, was not the product of the preceding violation of defendant's rights under Article I, section 9. We therefore conclude that the unlawful seizure of defendant vitiated his consent to the search and, for that reason, the evidence from that search is inadmissible under Article I, section 9.

### III. CONCLUSION

In sum, we conclude that, under the facts of this case, Deese's encounter with defendant constituted an unlawful stop under ORS 131.615(1) (1995) and, consequently, also an unlawful "seizure" under Article I, section 9. We also reaffirm that, to vindicate a violation of a defendant's rights under Article I, section 9, evidence from a search following an otherwise valid consent is subject to suppression under the Oregon exclusionary rule if the defendant's consent is the product of preceding unlawful police conduct. Finally, under the facts of this case, we conclude that the state failed to satisfy its burden of proving that defendant's consent was independent of, or only tenuously related to, the

---

intervening circumstances—relate to the causal connection between the preceding illegality and the defendant's confession or consent, and, for that reason, also are relevant to the decision whether exclusion is required to vindicate a defendant's rights under Article I, section 9.

preceding unlawful stop. Based upon those conclusions, we affirm the decision of the Court of Appeals and reverse the judgment of the trial court.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed.

**DURHAM, J.,** concurring in part and dissenting in part.

I agree with the majority's conclusion that the police unlawfully stopped defendant under ORS 131.615(1) (1995) and, thus, unlawfully seized him under Article I, section 9, of the Oregon Constitution.

The larger question in this case, however, concerns defendant's claim that the trial court erred in refusing to suppress the evidence that Officer Deese searched for and seized from defendant's pocket during the unlawful stop. According to the record, Deese stopped defendant, saw bulges under his jacket, and asked for permission to search defendant's person. In response, defendant gave his voluntary consent to the requested search.[1]

In this court, defendant acknowledges that his consent was voluntary, but argues that the court should disregard his voluntary consent because Deese exploited the prior

---

[1] The trial court made the following express findings:

"10) The officer asked if he could search the Defendant's person. The Defendant indicated okay. The officer then did a quick pat-down and felt no weapons.

"11) The officer reached in the Defendant's jacket and felt and removed a [vial]. Based upon his training and experience, the officer believed the [vial] contained controlled substance.

"This case is similar to *State ex rel [Juv.] Dept. v[.] Fikes*, 116 Or App 618[, 842 P2d 807] (1992). For the reasons set forth therein, Defendant's Motion to Suppress is denied."

In *Fikes*, 116 Or App 618, the Court of Appeals rejected a child's claim that his consent to a search by a police officer was involuntary. The court concluded that "child's consent was not the product of police coercion, but was voluntarily and knowingly given." *Id.* at 625.

In this case, the trial court made no express determination that defendant's consent to the search was voluntary. However, the trial court's express findings, quoted above, the court's citation of *Fikes* as "similar" to this case, the absence of any findings that Officer Deese coerced defendant to consent, and the trial court's denial of defendant's motion to suppress all confirm that, in the trial court's view, defendant's consent to the search was voluntary.

illegal stop to obtain permission to search. Defendant does not argue that the trial court must reexamine the voluntariness of his consent in light of the unlawfulness of the initial stop and seizure.

Reduced to its essence, defendant's argument asserts that he is entitled to the suppression of the evidence that Deese obtained from defendant's pocket notwithstanding defendant's voluntary consent to the exact search that Deese performed. The majority accepts that argument and requires suppression of the evidence on the theory that defendant's consent was the "product" of the unlawful initial stop and that the state did not show that the consent was "independent of," or was "only tenuously related to," the unlawful stop. 339 Or at 36-37.

If Officer Deese had unilaterally searched defendant's pocket without consent, or coerced defendant such that he overcame defendant's free will, then the majority's answer would be correct. But the fact that defendant voluntarily consented to the search makes (or *should* make) the crucial difference in the legal analysis of the reasonableness of the resulting search.

Instead of focusing correctly on the voluntariness of defendant's consent, as our cases require, the majority's analysis turns on facts that simply are inapposite, such as the fact that defendant's consent (even though voluntary) was "not spontaneous" because Deese *requested* consent to search. *Id.* at 44. Similarly, the majority emphasizes that Deese's request occurred immediately after Deese had questioned defendant about whether he was carrying any weapons or illegal drugs and while he was waiting for the results of a warrant check. *Id.* at 44-45. Those facts lead the majority to conclude that the state has failed to prove "that defendant's decision to consent, even if voluntary, was not the product of the preceding violation of defendant's rights under Article I, section 9,[ ]" and, consequently, the unlawful stop *vitiates* defendant's consent. *Id.* at 45.

The majority's approach is erroneous because it accords no analytical weight to the key fact of defendant's voluntary consent to the search. Instead, the majority's analysis turns on whether the fact that allowed the search to occur—defendant's voluntary consent—was the "product" of (that is,

whether the consent is the causal result of) the unlawful stop. According to the majority, because that causal relationship exists (or, rather, because the state failed to prove that that relationship did not exist), the resulting search is unconstitutional *notwithstanding* the voluntariness of defendant's consent to the search. But that reasoning blurs the distinction between the circumstances of the stop that have a mere "but for" causal link with the search and the one fact that was the genuine cause of the search. Because its view of the causation inquiry is faulty, the majority simply fails to assess the significance of the fact that triggered the search of defendant's pocket: *defendant voluntarily consented to the search.* The majority's resulting conclusion—that Deese's search of defendant's pocket was unreasonable and, thus, unlawful even though defendant voluntarily consented to the search— is a difficult pill to swallow.

The majority's reasoning represents a significant departure from the principles that have guided this court in previous consent search cases. First and foremost, this court has approved of the suppression of evidence only where the police conduct that brings the disputed evidence to light constitutes an unreasonable invasion of privacy. Here, Officer Deese's stop of defendant unquestionably was an unreasonable seizure, but the act of stopping defendant did not expose the disputed evidence to Officer Deese. The discovery of the disputed evidence occurred only after defendant gave his voluntary consent to a search of his person. *That* is the legally dispositive fact. Defendant's voluntary consent to the search demonstrates that the disputed evidence came to light as the result of a reasonable, not unreasonable, search.

The majority's approach effectively cancels the legal significance of defendant's voluntary consent and treats the officer's simple act of asking for permission to search as if it were an invasion of privacy. Heretofore, police officers properly have understood that there is no harm in asking for voluntary consent to conduct a search. After today, that understanding is in jeopardy. As the following discussion demonstrates, the majority's analysis results in a suppression of evidence without the necessary predicate that our cases require: an unreasonable invasion of privacy. Accordingly, I respectfully dissent from that aspect of the majority's opinion.

Article I, section 9, creates a right in the people to be "secure * * * against unreasonable search, or seizure * * *." A "search" occurs when the police invade a person's privacy interest in their persons, houses, papers, and effects. A "seizure" occurs when police significantly interfere with a person's possessory or ownership interests in property. *See State v. Owens*, 302 Or 196, 206-07, 729 P2d 524 (1986) (applying those definitions). This court vindicates that constitutional right in a criminal prosecution by suppressing evidence that the government has obtained in violation of that right. Thus, a key question in the resolution of defendant's motion to suppress evidence is whether the police "obtained" the evidence in defendant's pocket "in violation of" defendant's constitutional right to privacy.

Because defendant's motion seeks suppression of evidence that Deese searched for and seized without a warrant, the state bears the burden to demonstrate that Deese's search and seizure actions were reasonable and, therefore, lawful. Despite the absence of a warrant, a search or seizure is reasonable under Article I, section 9, if the police comply with the requirements of one or another of the recognized exceptions to the warrant requirement. *See State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992).

The state relies here on the exception for searches and seizures conducted pursuant to a legally valid consent. The consent exception to the warrant requirement applies if the state demonstrates that someone with authority to do so voluntarily gave the police consent to search the defendant's person or property and that the police complied with any limitations on the scope of the consent. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994).

A violation by police of a defendant's rights under Article I, section 9, may affect the validity of a subsequent search to which the defendant apparently has consented because the police conduct renders the defendant's consent involuntary. *See id.* at 219. The state has the burden of proving voluntariness by a preponderance of the evidence. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1994). The trial courts bear the initial responsibility to determine whether the state has satisfied that burden by examining whether,

under the totality of the circumstances, the defendant's consent was an act of free will, or, instead, resulted from express or implied police coercion. *See State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983). The totality of circumstances certainly includes the individual's responses, emotional and physical state, maturity and sophistication. *See* Wayne R. LaFave, 4 *Search and Seizure* § 8.2(e), 90-93 (4th ed 2004). But it also embraces the manner by which the officer conveys his request, including an admonition—if any is given—that the individual is not required to consent to a search, and whether the officer, by word or deed, seeks to hasten a consent or otherwise to bring added pressure to bear on the individual. The point of the trial court's comprehensive factual inquiry is to assure that the invasion by police of the individual's constitutionally protected privacy interest is the product of an authentic voluntary choice and not mere resignation to the authority of the police or the exigencies of the stop or arrest.

Police assertion of authority or control over an individual, either through an arrest or a lesser seizure, bears distinctively on the question of voluntariness whether or not the police conduct is lawful. That is so because an officer's assertion of control over a person's liberty implies the further authority to maintain that control and, incident to that control, to search the person and seize any contraband. *See* LaFave, 4 *Search and Seizure* § 8.2(d) at 79-80 (discussing principle and citing authorities). If a defendant consents in acquiescence to a claim of lawful police authority, the trial court properly should conclude that the lawfulness of the assertion of police authority determines the voluntariness of the resulting consent. *See, e.g., State v. Williamson*, 307 Or 621, 626-27, 772 P2d 404 (1989) (Carson, J., concurring). By contrast, unlawful police conduct can affect a defendant's capacity to exercise his or her free will and, thus, may undermine the voluntariness of a consent to search for purposes of Article I, section 9. *State v. Rodriguez*, 317 Or 27, 38-39, 854 P2d 399 (1993). Finally, under certain circumstances, the police conduct, even if lawful, may *coerce* the defendant into consenting. A coerced consent, by definition, is not voluntary. *See Rodriguez*, 317 Or at 38 n 13.

In this case, as noted above, defendant asserts no challenge to the trial court's implicit conclusion that defendant voluntarily consented to Deese's request to search his

pocket.[2] Neither does defendant raise any question about Deese's adherence to the scope of the consent granted. Defendant does not contend that the trial court's error in concluding that Deese neither stopped nor seized defendant somehow undermines, or requires reconsideration of, the trial court's determination that defendant's consent to the later search of his person was voluntary. Defendant's sole contention is that state and federal law requires suppression of the evidence that Deese searched for and seized from defendant's pocket, notwithstanding defendant's voluntary consent to that search, because suppression is necessary to vindicate the earlier violation of defendant's rights, i.e., the unlawful stop.

Defendant rests that argument on an application of the "fruit of the poisonous tree" doctrine that this court's cases have discussed. Although I ultimately reject defendant's argument, I note that not all our cases have discussed that doctrine in a consistent manner. For that reason, I discuss in detail why the contents of defendant's pocket are not subject to suppression under the "fruit of the poisonous tree" doctrine.

Under the "fruit of the poisonous tree" doctrine, this court examines the nature of the connection between unlawful police conduct and the evidence that the defendant seeks to suppress. In *State v. Kennedy*, 290 Or 493, 624 P2d

---

[2] In *State v. Warner*, 284 Or 147, 158-59, 585 P2d 681 (1978), this court stated the following in describing this court's authority to review a trial court's finding that a consent to a search was voluntary:

"We now specifically hold that an appellate court is not bound by a trial judge's finding of voluntariness of consent to a search or seizure if the appellate court finds the historical facts upon which the trial judge made his finding are insufficient to meet constitutional standards of due process. It follows, therefore, that neither the Court of Appeals nor this court is bound by the implicit conclusion of the trial judge in this case that defendant's compliance with Myers' 'request for identification' was voluntary."

(Footnote omitted.) To the same effect, see *State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981), *citing Warner* and *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). Because defendant does not challenge the trial court's implicit voluntariness determination in this case, I accept that determination.

Trial courts provide valuable assistance to our appellate courts when they make express findings of fact and conclusions of law on critical issues, such as the voluntariness of a defendant's consent to a search.

99 (1981), this court, relying on an explanation of that doctrine by the United States Supreme Court, confirmed that more is required to justify a suppression of evidence than a mere "but for" causal link between the evidence and a prior police illegality:

"The United States Supreme Court has held that the existence of a police illegality does not automatically require suppression of evidence discovered subsequent to that illegality. In *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 LEd 2d 441 (1963), the Court rejected a 'but for' test which would require that evidence must be suppressed if it would not have been discovered 'but for' the illegal police actions. Instead, the Court said:

" 'We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' 371 US at 487-88."

*Id.* at 500.

The determinative issue under that doctrine is whether, assuming an initial police illegality, the police have obtained ("come at") the challenged evidence by an exploitation of that illegality or, instead, have obtained it by means sufficiently distinguishable to be purged of the taint of the initial police illegality. When applying that doctrine, we always must keep in mind two distinct policy justifications that bear on the answer to that issue.

The first is that the predicate for Oregon's exclusionary rule is the court's responsibility to vindicate the invasion by the police of a defendant's personal rights under Article I, section 9, in obtaining evidence. This court has held that an individual's personal right to be free from unreasonable searches and seizures under that provision also embraces a right to deny the state any ability to use evidence obtained in violation of that right to convict the individual of a crime. *See*

*State v. Davis*, 313 Or 246, 249, 834 P2d 1008 (1992) (recognizing principle). Oregon's rights-based exclusionary rule stands in contrast to the deterrence-based rationale that underlies Fourth Amendment jurisprudence. Because our exclusionary rule rests on a theory of protection of a personal right, the exclusion of evidence follows only from a demonstration that the police obtained the evidence by violating a right secured by Article I, section 9. *See State v. Smith*, 327 Or 366, 379-80, 963 P2d 642 (1998) (where evidence obtained after, but not by virtue of, unlawful police conduct, suppression not required).

The second is that, when determining whether the facts require the exclusion of evidence, this court seeks to restore a defendant to the same position as if "the government's officers had stayed within the law." *Davis*, 295 Or at 234. Thus, the fact that evidence comes to police attention following, or due only to "but for" causation by, police misconduct is insufficient to require a suppression remedy. Instead, the police misconduct, rather than some other independent agency, must be the source that causes the police to obtain the disputed evidence. For example, a showing that the observance of lawful procedures inevitably would have brought the evidence to light would obviate the need for suppression. *See State v. Johnson*, 335 Or 511, 526, 73 P3d 282 (2003) (discussing inevitable discovery of evidence).

Relying on the above-cited authorities, defendant argues that Deese exploited the unlawful stop, because he was in a position to observe the bulges in defendant's coat solely by reason of the unlawful stop. Defendant claims that the bulges in the coat, in turn, motivated Deese to request consent to engage in a search of defendant's person and that that request led immediately to the discovery of the disputed evidence. According to defendant, nothing attenuated the taint of the unlawful stop and its close factual connection to the discovery of the contents of defendant's pocket.

Defendant's arguments fail because they do not acknowledge the role of defendant's voluntary consent in Deese's discovery of the disputed evidence. In explaining that conclusion below, I demonstrate why several cases on which defendant relies in reality lend him only superficial support.

In *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), this court, relying on *Wong Sun*, emphasized that whether a police illegality creates a "taint" on a subsequent search or seizure of evidence depends on the influence of the illegality on the defendant's exercise of free will in apparently consenting to the search or seizure, and does not depend on the influence of the illegality as a source of police knowledge. This court stated:

> "The nature of the causal relationship between unlawful police action and subsequently obtained evidence, which triggers the exclusionary rule, was considered in the leading case of *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), in which the United States Supreme Court elaborated on * * * 'fruit of the poisonous tree' doctrine. *Under Wong Sun, the influence of the illegality on defendant's exercise of will, rather than the source of police knowledge, determines whether there is taint.* The facts of the case illustrate this principle. Two statements were involved in *Wong Sun*: one by Toy and one by Wong Sun. Government agents unlawfully entered and searched Toy's home. Toy then and there confessed that he had obtained narcotics from one Yee. The agents then went to Yee who surrendered heroin to them. Yee said he obtained it from Toy and Wong Sun. The latter two were arrested and released on recognizance. Several days later, Wong Sun visited the agents. Upon being advised of his rights, Wong Sun made a statement. The United States Supreme Court required suppression of Toy's confession because it was a direct result of the agents' unlawful entry. Wong Sun's statement, however, was held admissible because it was the product of intervening events and not the product of the unlawful entry even though the police had learned of Wong Sun's involvement in a chain of events which began with the unlawful arrest.

> "In so holding, the court rejected what might be called the 'but for' test under which evidence must be excluded if any link in the chain of circumstances leading to the evidence involves unlawful police action. Were that the rule, Wong Sun's confession would have been suppressed. Rather, the dispositive consideration was whether Wong Sun's decision to make a statement was a result of the illegality or due to other factors."

*Id.* at 395-96 (footnote omitted; emphasis added).

Although I criticize below another aspect of the holding in *Quinn*, the passage quoted above states Oregon law correctly. Under the principle from *Quinn* emphasized above, the trial court's wide-ranging inquiry into the voluntariness of the defendant's consent to a search or seizure subsumes an assessment of the impact of any police illegality on the defendant's exercise of will in granting consent. In the consent search context, the determinitive issue is whether the defendant decided to consent voluntarily or, instead, decided to do so due to other factors, such as any taint resulting from unlawful police conduct. The police illegality, as *Quinn* noted, may provide the police with information which, in turn, may motivate them to request consent. However, the decisive inquiry in the consent context is not the police motive for seeking consent but whether the defendant's consent, under all the circumstances, was voluntary.

Another aspect of the analysis stated in *Quinn* deserves further comment. *Quinn* involved an unlawful search of the defendant's vehicle during which the police discovered a pair of women's underwear that linked the defendant to a murder. Without informing the defendant of their discovery, the police sought and obtained the defendant's consent to search the vehicle. The police searched the vehicle again, seized the underwear, confronted the defendant with that evidence, and obtained the defendant's confession to the murder.

On review before this court, the defendant challenged the admissibility of the underwear under Article I, section 9. Purporting to apply the rule in *Wong Sun*, this court rejected the defendant's assertion that the initial unlawful vehicle search had tainted his decision to consent to the second search. The court reasoned that the defendant had no knowledge of the illegal first search of the vehicle and, therefore, that illegality could not "taint" his voluntary consent to the second search.

The *Quinn* court's reliance on the defendant's lack of knowledge of the first vehicle search may have been an error, although a determination of that issue, strictly speaking, is not essential to the correct resolution of this case. The first vehicle search was itself an unconstitutional invasion of the

defendant's right to privacy under Article I, section 9. Thus, and even if the police later seized the underwear after a second search with the defendant's valid consent, the defendant nevertheless may have been entitled to the suppression of that evidence to vindicate the violation by the police of his constitutional right of privacy during the first vehicle search. I leave for another day whether this court should so hold in a case that presents that question.

Here defendant contends that, despite the voluntariness of his consent, the illegal stop disadvantaged him by affording the officer the opportunity to see the bulges in his jacket, thus creating the motivation to seek consent to search. Defendant argues that suppression is necessary to restore him to the position that he would have occupied had the officer not stopped him illegally.

My previous discussion of *Quinn* undermines defendant's premise that a police illegality that precedes a consent to search may require suppression of evidence because, apart from its impact on the voluntariness of consent, it affords the police information that motivates them to seek consent to search. Despite that problem, defendant purports to find support for his position in *Rodriguez* and *Kennedy*. For the reasons discussed below, I disagree.

In *Rodriguez*, a governmental agent arrested the defendant at his apartment and asked whether the defendant had any drugs or guns in the apartment. The defendant responded by saying, "No, go ahead and look." The agent questioned whether the defendant meant to authorize a search, and the defendant again stated his willingness to permit a search. The governmental agents searched the apartment and discovered two guns. 317 Or at 29-30.

On review, this court assumed that the arrest was unlawful but rejected the claim that Article I, section 9, required suppression of the guns. The court noted at the outset that the case presented no challenge to the trial court's determination that the defendant had consented voluntarily to the search of his apartment. *Id.* at 38. Despite certain shortcomings that I note below, *Rodriguez* properly determined that the conduct of the governmental agents did not undermine the legitimacy of the defendant's consent to a

search. The court also correctly observed that, where a police illegality precedes a consent to search, suppression of evidence was an appropriate remedy only if the police *obtained* the evidence *in violation of* a defendant's rights. *Id.* at 39.

The *Rodriguez* court provided two examples in which the facts would justify suppression. The first involved unlawful police conduct that undermined the voluntariness of consent. *Id.* at 38. The second involved an unlawful search or seizure that preceded a consent search:

> "Where, as here, the question of the voluntariness of the consent has not been raised, or where the court has determined that the consent was voluntary, unlawful police conduct occurring before a consent search still may affect the admissibility of evidence seized during that search. This is so because that unlawful conduct—either an unreasonable search or an unreasonable seizure—occurring before the consent search was a violation of the defendant's rights, even if the consent search by itself was not. Put differently: There may be cases in which suppression of evidence obtained during a consent search may be necessary to vindicate a defendant's rights that were violated by earlier, unlawful police conduct."

*Id.* at 39.

I note that the *Rodriguez* court's second example, quoted above, reflects precisely the facts in *Quinn, i.e.*, an illegal search that preceded a voluntary consent to conduct roughly the same search. Consistently with my preceding discussion of *Quinn*, I conclude that, if those facts require suppression, it is not because the police have exploited an illegality to obtain consent, but because the initial unconstitutional invasion of the defendant's privacy by the police brought the challenged evidence to light notwithstanding the defendant's subsequent consent. Properly understood, the court's second example entailed the ordinary remedy—suppression—for an unlawful search, not an instance of the exploitation of a prior illegality that taints the voluntariness of a later consent.

Relying on its example of a purported "exploitation" of a police illegality, the *Rodriguez* court explained:

"We think that evidence obtained during such a search should be suppressed only in those cases where the police have exploited their prior unlawful conduct to obtain that consent. Only where such exploitation occurs can it be said that the evidence discovered subsequently was 'obtained in violation' of a defendant's rights under Article I, section 9."

*Id.* at 40.

I conclude that that attempted statement of the pertinent issue comes up short.[3] As the passage from *Quinn* quoted above demonstrates, 339 Or at 45-46, the initial question under *Wong Sun* is whether the police have come at the disputed *evidence*, not merely the facts that motivate the police to seek the defendant's consent, by exploiting a primary police illegality. Additionally, *Wong Sun* requires a determination whether, notwithstanding the prior illegality, the police have acquired the *evidence* by means sufficiently distinguishable to be purged of the primary taint. A defendant's voluntary choice to consent to a search, notwithstanding a prior police illegality, can affect significantly the answer to each issue that *Wong Sun* describes. Finally, *Rodriguez*, failed to focus on the pivotal principle from *Quinn, i.e.*, that the factor that determines whether a prior police illegality "taints" a discovery of evidence in a consent search is the influence of the illegality on the defendant's exercise of will, not whether the illegality is a source of police knowledge.

Although the *Rodriguez* decision cited the *Quinn* case, it failed to follow correctly the "fruit of the poisonous tree" analysis that *Quinn* prescribed. The *Rodriguez* court should have determined, in accordance with *Quinn*, that, following the police illegality, the defendant had voluntarily consented to the search that produced the disputed evidence, the defendant did not challenge the voluntariness of his consent to the search, and, consequently, the police had not

---

[3] *Rodriguez* purported to draw support for its approach to exploitation from a vehicle search case, *State v. Williamson*, 307 Or 621, 772 P2d 404 (1989). *Rodriguez*, 317 Or at 40-41. However, the *Rodriguez* court correctly observed, *id.* at 40 n 14, that this court resolved *Williamson* "on grounds of voluntariness, rather than simply exploitation." Thus, the suggestion in *Rodriguez* that the result in *Williamson* "*may* also be explained as based on an exploitation analysis[,]" *Rodriguez*, 317 Or at 40-41 (emphasis added), overstated the degree to which *Williamson* supported the analysis offered in *Rodriguez*.

obtained the evidence in violation of the defendant's constitutional right to privacy.

There was no reason for the *Rodriguez* court instead to have suggested, in contravention of the legal principle described in *Quinn*, that a defendant also might obtain a suppression of evidence by demonstrating that facts that had come to light by reason of the prior police illegality motivated the police to seek consent for a search. That suggestion adopts the wrong focus. The critical inquiry under *Quinn*, in the context of a consent search, is the voluntariness of the consent, not the source of police knowledge that may have triggered the request for consent. *Rodriguez* incorrectly placed the emphasis on the state of mind of the police, rather than the voluntariness of the defendant's consent. That approach simply avoids answering the important analytical questions whether the police have *obtained* the evidence *in violation of* the defendant's constitutional rights, and whether the initial police illegality bears more than a "but for" causal relationship to the evidence that the consent search produced.

I turn next to *Kennedy*. In that case, two police officers approached the defendant as he was leaving the Portland airport, asked if they could speak with defendant, and identified themselves as officers. The officers informed defendant that they had information that he might be carrying illegal narcotics on his person or in his luggage. The defendant denied that allegation. Without any prompting from the officers, defendant asked them if they wanted to search his luggage. The officers accepted, searched defendant's bag, and subsequently discovered a small vial, which contained cocaine residue. *Kennedy*, 290 Or at 495-96.

On review, this court assumed that the police encounter with defendant had been unlawful. It determined, however, that the evidence was admissible due to "the absence of any coercive circumstances surrounding [the] defendant's consent, and [the] defendant's volunteering of consent, with no request by the police." *Id.* at 506. Relying on *Wong Sun*, the court stated that "the evidence is to be suppressed only if it is found that the consent was gained by exploitation of the illegality or that defendant's free will was

tainted by the illegal police conduct." *Id.* at 501. That statement, like the similar statement noted above in *Rodriguez*, suggests inaccurately that the "fruit of the poisonous tree" analysis addresses the circumstances that induce the police to request consent, rather than the voluntariness of the consent granted. However, consistent with the correct rule in *Quinn*, the balance of the opinion in *Kennedy* focused on whether the defendant consented to the search voluntarily. The *Kennedy* court held that, regardless of whether the police had stopped the defendant illegally, the defendant had consented voluntarily to a search of his luggage. *Id.* at 506. Thus, when construed properly, *Kennedy* supports the state here, not defendant.

I am not unmindful of defendant's concern that an unlawful stop or arrest, and the varying sorts of pressure and anxiety that often surround the lawful or unlawful assertion of police authority over a citizen, easily can create a coercive atmosphere in which citizens do not give a genuinely voluntary consent to a search. But a trial court is well able to examine, and *must* examine, *all* of those concerns in the course of determining the voluntariness issue. That analytical inquiry fully vindicates the rights of the defendant. That approach is preferable to creating an entitlement to a suppression remedy for unlawful police conduct that merely precedes, but does not taint, a later valid consent to a search that brings disputed evidence to light. Recognizing a right to suppression of evidence, notwithstanding the voluntariness of the defendant's consent to the search, might be consistent with the deterrence rationale that the federal courts employ in resolving search and seizure disputes. However, I see no justification for doing so pursuant to the rights-based approach that this court follows under Article I, section 9.

The legal principles discussed above lead to a straightforward answer on the facts of this case. The state obtained the evidence that defendant seeks to suppress by way of a search of defendant's pocket. Before the search, defendant told Deese that he consented to that search. After examining all the pertinent circumstances, the trial court necessarily concluded that defendant's consent was voluntary, and defendant makes no challenge to that determination in this court.

It is true that defendant gave his consent during the course of an unlawful stop, that Deese requested defendant's consent, and that the request occurred not long after the unlawful stop commenced. Deese's observations during the stop may have aroused his suspicions. However, Deese did not *unilaterally* search for or seize *any* evidence in defendant's possession. Rather, he asked for and received voluntary consent to search. Although the unlawful stop has a "but for" causal relationship to the search of defendant's pocket, that is the most that can be said for it. The critical inquiry is whether any of the circumstances surrounding the stop tainted the later search and seizure by undermining the voluntariness of defendant's consent. The undisputed answer to that question is no. Because the police did not obtain the challenged evidence in violation of defendant's rights under Article I, section 9, the search was reasonable. The trial court properly denied defendant's motion to suppress.

Finally, defendant advances in this court an argument that the stop and subsequent search and seizure violated the requirements of the Fourth Amendment to the United States Constitution. My examination of the record satisfies me that, in the Court of Appeals, defendant did not preserve his federal law claim for review by this court. Accordingly, I do not address that claim.

Because the trial court correctly refused to suppress the evidence seized from defendant's pocket, I respectfully dissent from the majority's contrary determination.

Gillette, J., joins this opinion.