BREWER, J.,
dissenting.
Article I, section 9, of the Oregon Constitution protects the personal right to be secure against unlawful searches and seizures. State v. Davis, 313 Or 246, 253-54, 834 P2d 1008 (1992); State v. Kosta, 304 Or 549, 553, 748 P2d 72 (1987); State v. Tanner, 304 Or 312, 315-16 n 2, 745 P2d 757 (1987). When the government violates that right by conducting an unreasonable search or seizure in obtaining evidence, the right is protected “through the sanction of [the] suppression of evidence.” Davis, 313 Or at 253. Suppression *114 is justified by the rationale that it is necessary to place the person subjected to the violation in the same position as if no violation had occurred. Id. at 254.
Questions frequently have arisen concerning the causal connection between a person’s consent to search and a preceding violation of his or her right to be free from an unlawful search or seizure. The argument that, where consent is voluntary, there is no constitutional right to be restored to the person has persistently been made. See, e.g., State v. Rodgers/Kirkeby, 347 Or 610, 642-43, 227 P3d 695 (2010) (Durham, J, dissenting). Although the majority does not subscribe to that argument, to properly resolve cases like this one, it is nevertheless important to understand why that argument is mistaken. When a person consents to a warrantless search of his or her person or property and the person’s capacity for self-determination has not been overborne or critically impaired, the consent is voluntary. State v. Stevens, 311 Or 119, 133-38, 806 P2d 92 (1991). However, that does not necessarily mean that the person has knowingly relinquished his or her right under Article I, section 9, to be free from unreasonable searches and seizures. That is because consent to search can be voluntary but not amount to a knowing waiver of the person’s constitutional rights. In particular, the person may not know that the conduct that placed the officer in a position to seek consent was unlawful or that the person has a right under Article I, section 9, to refuse consent. That is, even though the person’s free will has not been overborne or critically impaired in the sense required to make the consent to search involuntary, he or she still may be missing vital information that the officer has not disclosed which, if known, would have affected the decision to give consent. For that reason, there remains a constitutional right to safeguard under Article I, section 9, where unlawful police conduct preceded the giving of voluntary consent to a search. State v. Hall, 339 Or 7, 34-35, 115 P3d 908 (2005).
As the majority notes, the state has the burden to prove by a preponderance of the evidence that a warrantless search is valid. State v. Tucker, 330 Or 85, 90-91, 997 P2d 182 (2000); ORS 133.693(4). To satisfy that burden where unlawful police conduct preceded the giving of voluntary *115 consent to search, the state must prove that evidence that the police obtained as a result of the search did not derive from the unlawful conduct. Hall, 339 Or at 24. To do so, the state must show that (1) the police inevitably would have discovered the evidence through lawful procedures in the absence of the illegality; (2) the state obtained the evidence independently of the violation of the defendant’s rights; or (3) the factual link between the violation and the evidence is so “tenuous” that the violation cannot be viewed as the source of the evidence. Id. at 25. Where, as here, the state relies on the third path, that is, attenuation, the state must show that the unlawful conduct did not “significantly affect” the defendant’s decision to give consent, even if the consent itself was voluntary. Id. at 32, 35.
The considerations that this court identified in Hall are “relevant to” the determination whether unlawful police conduct significantly affected the giving of consent. Id. Those considerations are (1) the “temporal proximity” between the unlawful police conduct and the defendant’s consent; (2) the existence of any intervening circumstances; and (3) the presence of any other circumstances, such as Miranda warnings or other admonitions, that would have informed the defendant of his or her right to refuse consent and would have mitigated the effect of the illegal police conduct. Hall, 339 Or at 35.[1] The primary question in this case is whether other factors, including the purpose and flagrancy of police misconduct leading to the giving of consent, should be balanced against the considerations identified in Hall.
Because the factors of purpose and flagrancy that the majority introduces derive from Fourth Amendment jurisprudence, it is useful to consider the historical similarities *116 and differences between federal and Oregon attenuation analyses involving consent searches. As this court noted in Hall,
“In Brown v. Illinois, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), the United States Supreme Court also identified some of these considerations as relevant to deciding the admissibility of a defendant’s voluntary statements following a Fourth Amendment violation. See id. at 603-04 (in deciding whether Fourth Amendment exclusionary rule requires suppression of defendant’s voluntary statements following unlawful arrest, court should consider whether police provided defendant with Miranda warnings, along with ‘ [t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct’). *** [T]he Brown factor of‘purpose and flagrancy of the official misconduct’ relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9. The other considerations that the Supreme Court identified in Brown — namely, whether the police had provided the defendant with Miranda warnings (or, in the case of a consent search, with a warning that the defendant had the right to refuse consent), the temporal proximity between the illegality and the defendant’s confession or consent, and the presence of intervening circumstances — relate to the causal connection between the preceding illegality and the defendant’s confession or consent, and, for that reason, also are relevant to the decision whether exclusion is required to vindicate a defendant’s rights under Article I, section 9.”
Hall, 339 Or at 35 n 21. In short, the attenuation analy-ses for consent searches under the federal and state constitutions generally employ similar factors, but the federal analysis includes additional factors — purpose and flagrancy of police misconduct — that the court in Hall rejected based on differences in the underlying natures of the two constitutional provisions: The Fourth Amendment aims at deterring police misconduct, whereas, Article I, section 9, focuses on the protection of personal rights.[2] Although the majority in *117 this case notes those differences in constitutional focus, it disagrees with the fundamental premise of Hall that the factors of purpose and flagrancy are immaterial to a rights-based analysis under Article I, section 9. As explained below, I do not share that view.
To characterize unlawful police conduct as “purposeful” means that the misconduct was investigatory in design and purpose and executed “in the hope that something might turn up.” Brown, 422 US at 605; United States v. Simpson, 439 F3d 490, 496 (8th Cir 2006). Because the relevant inquiry under Article I, section 9, is whether a person’s consent was significantly affected by preceding police misconduct, the purpose of the misconduct is immaterial to the analysis unless that purpose was apparent to the suspect. However, even where a suspect knows the purpose of police conduct, determining the effect of such knowledge on the decision to give consent does not necessarily get at the problem. The facts of this case illustrate the point. Here, defendant knew from the outset of his encounter with the officers that the purpose of their presence was investigatory, and he may well have inferred from their request for consent to enter his residence that they were hoping to find contraband. However, there is no evidence that defendant knew that the officers’ presence at his bedroom door was unlawful. As discussed below, knowing that fact when the officers requested consent might well have made a difference in defendant’s decision.
*118 A related problem exists with respect to applying the factor of flagrancy. Misconduct is “flagrant” when its “impropriety * * * was obvious or the officer knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless.” Green, 439 F3d at 496 (citing Brown, 422 US at 605). That is, flagrancy refers to the officer’s knowledge, or likely awareness, of the illegality of his or her conduct. Of course, conduct that is obviously unlawful in the eyes of a trained and experienced police officer may be carried out in such a way that an uninformed suspect would not know that it is unlawful. In that circumstance, the flagrancy of the misconduct would not affect the suspect’s giving of consent, and it therefore would not be relevant to the analysis under Article I, section 9.
On the other hand, police conduct whose unlawfulness is obvious to a suspect can affect the giving of consent, even when it does not literally overcome the free will of the suspect. The question is how such manifest flagrancy should be weighed or balanced, if at all, in the attenuation analysis. Under the majority’s conception, it would appear that politely executed police misconduct — although obviously illegal — may not unlawfully taint consent even when it is given in close temporal proximity to the misconduct, no intervening circumstances operate to break the causal connection between the two, and the suspect is not advised of his or her right to refuse consent.
In my view, it is in this vexing cranny of Oregon’s search and seizure jurisprudence that there is a special— albeit supplemental — space for deterrence, even though the primary focus of Article I, section 9, is to protect personal rights. If unlawful police conduct is flagrant in a way that is pertinent to the attenuation analysis in consent cases — that is, its unlawfulness is obvious to the officer and suspect alike — then it has no business occurring, even if delivered in an inoffensive wrapper. Flagrant misconduct, however committed, should weigh heavily in favor of suppression both to protect personal rights and so that officers are not tempted to think that they can engage in unlawful evidence-generating acts with impunity as long as they do so courteously.
*119 But, where police misconduct is not flagrant in the constitutional sense, that is, where the officer does not know or likely know that he or she has engaged in unlawful conduct, and if there is no reason for the suspect to know that the conduct is unlawful either, there still remains a risk that the unlawful conduct will significantly affect the giving of consent when the latter follows the former in brief sequence and the suspect is not advised that he or she is free to refuse consent. In other words, the fact that police conduct was not obviously unlawful does not necessarily make it less likely that the misconduct affected the giving of consent. Thus, subject to the caveat discussed below, there is little room in a rights-focused conception of Article I, section 9, for a lack of flagrancy in unlawful police conduct to weigh in favor of attenuation in the context of a consent search where other factors point in the direction of suppression.
That said, as this court stated in Hall, the issue is what “effect” unlawful police conduct had on a suspect’s decision to give consent to search. Hall, 339 Or at 32. For that reason, it is tempting to agree — at least in principle— with the logic of the following statement by Justice Kistler in his dissenting opinion in State v. Ayles, 348 Or 622, 654, 237 P3d 805 (2010):
“The degree of attenuation necessary to purge the taint varies with the extent of the taint, and where * * * any taint is minimal, the required degree of attenuation is correspondingly reduced. The point has nothing to do with deterrence. Rather, under a rights-based suppression analysis, the degree of attenuation necessary to purge the taint (and thus restore the defendant to the position he or she would have been in had no constitutional violation occurred) varies with the extent, nature, and severity of any illegality. Any other rationale would give a constitutional violation that had only minimal effect far greater reach than either the constitution requires or good sense warrants.”
I cannot rule out the possibility that nonflagrant but unlawful police conduct that is relatively brief in duration and “minor” in its nature and degree of severity might not significantly affect a suspect’s decision to give consent yet still qualify as an unreasonable search or seizure for constitutional purposes. Such a bare constitutional violation *120 arguably could be a mere “but for” cause of obtaining disputed evidence, and thus not require suppression.[3] See Hall, 339 Or at 25 (“[T]his court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained ‘but for’ unlawful police conduct.”). It is difficult, however, to conceive of obvious examples of a “minor” constitutional violation that likely would have had only a minimal effect on consent without resorting to fine distinctions such as “unreasonable but just barely so.” It is unsurprising that this court in Hall did not undertake or endorse such a hairsplitting analysis. Judging degrees of relative severity in determining the effect of a constitutional violation on a defendant’s consent does not readily lend itself to principled and predictable decision making, and it is therefore best avoided except in the most obvious case. This, in my view, is not such a case.
As noted, the state had the burden of showing by a preponderance of the evidence that the warrantless entry into and ensuing search of defendant’s residence was valid. Tucker, 330 Or at 90-91. Thus, the state was required to prove that the police trespass in this case did not significantly affect defendant’s consent for the police to enter and search his residence. Hall, 339 Or at 34-35. The evidence showed that the police officers here had knocked for a significant period of time at doors of defendant’s residence where they lawfully could be present. After receiving no response for “two to three minutes,” they then unlawfully entered the backyard of the residence and, knocking at a sliding glass door to defendant’s bedroom, roused him out of bed. Without advising defendant that he did not have to allow them further entry, one of the officers told defendant that the police had received complaints of drug activity at his residence and asked defendant if he could enter. Defendant asked to put on a robe and then allowed the four officers to enter.
*121 Defendant led the officers from his bedroom, where his girlfriend was still in bed, into his kitchen. An officer repeated that they were investigating complaints about drug activity and asked defendant if he would show them around the house. Although the officers were polite and the tone of the encounter was conversational, few people subjected to it would regard such an intrusive, focused, and determined police presence at their backyard bedroom door as a minor or insignificant factor in deciding whether to give consent to search their residence. Unsurprisingly, defendant did give consent. Only after locating incriminating evidence inside the residence did an officer read defendant a prepared “consent to search” card. At that point, defendant exercised his right to counsel, refused to sign the card, and, again, predictably — but too late — asked the officers to leave.
Here, the unlawful trespass violated defendant’s right to be secure against unreasonable searches of his personal residence, because it closely preceded the initial giving of consent, no cognizable intervening circumstance broke the causal connection between the officers’ unlawful presence at defendant’s bedroom door and the giving of consent (or the ensuing discovery of the challenged evidence), and the advice of rights came too late to make a practical difference in defendant’s initial decision to give consent. To punctuate matters, once defendant understood his rights, he belatedly asked the officers to leave. Finally, and moreover, even if the flagrancy of the police misconduct in this case were relevant to the attenuation analysis, there was no evidence that the officers mistakenly but reasonably believed that they had acted lawfully in entering defendant’s backyard and knocking on his bedroom door, much less that any such belief affected defendant’s decision whether to give consent to the ensuing entry into and search of his residence.
Accordingly, I would conclude that the state failed to meet its burden to show by a preponderance of the evidence that the police trespass did not significantly affect defendant’s consent to the entry into and search of his residence. Suppression was required in those circumstances, even though defendant voluntarily consented to the entry and initial search of his residence. In my view, to so conclude does not undervalue the effect of defendant’s consent; *122 rather, it accords that consent the reduced weight to which it is properly entitled in the attenuation analysis, where the police engaged in unlawful conduct in an effort to obtain the consent and there is no indication that, in giving it, the defendant was aware either of the unlawfulness of the police conduct or of his right to refuse. I therefore respectfully dissent.

 The court in Hall stated that “determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case.” 339 Or at 35. Interestingly, each of the considerations that the court identified is an objective indicator of the strength of a causal connection between police misconduct and consent or the evidentiary fruits of an ensuing search. That is, none of those considerations necessarily indicates whether police misconduct actually affected the giving of consent in a particular case. Because the state has the burden of proving that a warrantless search is valid, and the defendant cannot be compelled to testify, it is perhaps unsurprising that objective considerations would bear primary emphasis in determining what might otherwise appear, in the terms that the court framed it, to be a subjective inquiry.

 Whether there are constitutionally grounded reasons for that “either-or” distinction is a different matter. Because the most effective way to uphold a constitutional right is to eliminate the incentive to knowingly violate it, I fail to *117 understand why a deterrence-based rationale for suppression should not supplement the rights-based focus of Article I, section 9. This court came close to — but fell short of — saying as much in State v. McMurphy, 291 Or 782, 785, 635 P2d 372 (1981):
“[T]he deterrent effect on future practices against others, though a desired consequence, is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized. In demanding a trial without such evidence, the defendant invokes rights personal to himself.”
The court’s reticence was understandable, in that it probably foresaw the unfortunate consequences of an analysis that either supplants a rights-based focus with a deterrence rationale or uses lower deterrence value as a counterweight to the protection of personal rights where the court perceives a constitutional violation to be “minor.” For that reason, I would insist on describing deterrence as a supplemental — not alternative or collateral — rationale for suppression where consent to search is not fully informed.

 “In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that ‘but for’ the antecedent conduct the result would not have occurred.” W. La Fave & A. Scott, Handbook on Criminal Law 249 (1972).